Debra K. Sands, Plaintiff-Appellant,†

v.

John R. Menard, Jr., Menard, Inc., Menard
Thoroughbreds, Inc., Webster Hart as Trustee of
the John R. Menard, Jr. 2002 Trust and
Related Trusts, Angela L. Bowe as Trustee
of the John R. Menard, Jr. 2002 Trust and
Related Trusts and Alphons Pitterle as
Trustee of the John R. Menard, Jr.
2002 Trust and Related Trusts,
Defendants-Respondents,

Midwest Manufacturing Co., Wood Ecology Inc.,
Countertops Inc., Team Menard Inc.,
Menard Engine Group, Menard Competition
Technologies LTD, MC Technologies Inc.,
Menard Engineering LTD, UltraMotive LTD
and Merchant Capital LLC, Defendants.
[Case No. 2012AP2377].

Debra K. Sands,
Plaintiff-Appellant-Cross-Respondent,†

v.

John R. Menard, Jr., Menard, Inc.,
and Menard Thoroughbreds, Inc.,
Defendants-Respondents-Cross-Appellants,

† Petition for Review filed.

126

WEBSTER HART as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts, Angela L. Bowe as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts, Alphons Pitterle as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts, Midwest Manufacturing Co., Wood Ecology Inc., Countertops Inc., Team Menard Inc., Menard Engine Group, Menard Competition Technologies LTD, MC Technologies Inc., Menard Engineering LTD, UltraMotive LTD and Merchant Capital LLC, Defendants. [Case No. 2015AP870].

Court of Appeals

*Nos. 2012AP2377, 2015AP870. Submitted on briefs June 28, 2016.—Decided September 20, 2016.*

2016 WI App 76

(Also reported in 887 N.W.2d 94.)

127

130

On behalf of the plaintiff-appellant-cross-respondent the cause was submitted on the combined briefs of *Charles K. Maier, Daniel R. Shulman* and *Richard C. Landon* of *Gray, Plant, Mooty, Mooty & Bennett*, P.A., Minneapolis, MN, and *Mel C. Orchard, III* of *The Spence Law Firm, LLC,* Jackson, WY.

On behalf of the defendants-respondents, Webster Hart, Angela L. Bowe and Alphons Pitterle, the cause was submitted on the briefs of *Todd Wind of Fredrikson & Byron, PA* of Minneapolis MN, and *G. Richard White* of *Weld Riley, S.C.*, Eau Claire.

On behalf of the defendants-respondents-cross-appellants, the cause was submitted on the combined brief of *Michael D. Freeborn, Brian P. Norton* and *Andrew C. Nordahl* of *Freeborn & Peterson, LLP*, Chicago, IL, and *G. Richard White* of *Weld Riley, S.C.* of Eau Claire.

Before Stark, P.J., Hruz and Seidl, JJ.

¶ 1. STARK, P.J. This case involves, in part, the extent to which an attorney can assert a claim under

*Watts v. Watts*, 137 Wis. 2d 506, 405 N.W.2d 303 (1987), arising out of legal services allegedly provided to a cohabiting partner and his businesses. Debra Sands appeals orders dismissing her claims against John Menard, Jr., Menard, Inc., and Menard Thoroughbreds, Inc., ("the Menard Defendants")[1] and against the trustees of the John R. Menard, Jr. 2002 Trust and related trusts ("the Trustees"). Sands claims she cohabitated with Menard from 1998 until 2006, and during that time she performed work for Menard and his companies that increased their value and for which she was not fully compensated. Sands further claims Menard repeatedly represented to her during their relationship that he would give her ownership interests in his companies as compensation for her services, but he has since failed to do so.

¶ 2. For the reasons explained below, we conclude the circuit court properly granted summary judgment dismissing Sands' claims against the Menard Defendants and the Trustees. We also conclude the court properly granted summary judgment to Sands on Menard, Inc.'s counterclaim for breach of fiduciary duty. We therefore affirm.

## BACKGROUND

¶ 3. Menard is the founder of Menards, a highly successful, privately held chain of home improvement stores, and is president and chief executive officer (CEO) of Menard, Inc. In November 1997, nearly forty years after starting his business, Menard began dating

---

[1] We refer to John Menard, Jr., Menard, Inc., and Menard Thoroughbreds, Inc., collectively, as "the Menard Defendants." We refer to John Menard, Jr., individually, as "Menard" and to Menard, Inc., individually, as "Menard, Inc."

Sands. Sands had graduated from William Mitchell College of Law in 1993 and was licensed to practice law in Minnesota.

¶ 4. Sands contends she moved into Menard's home in August 1998, and they became engaged in December 1998. She claims they lived together until their relationship ended in April 2006. Menard concedes he and Sands were engaged; however, he denies they ever lived together.

¶ 5. It is undisputed that, during Sands' relationship with Menard, she performed work on behalf of Menard and his companies. Sands asserts:

Among the many contributions Sands made, in addition to being Menard's life's partner, social companion, and manager and hostess of his households, were acting as a "gate-keeper" to screen Menard from unwanted approaches; supervising his health care and medical needs; managing the remodeling of three residences; advising on the acquisition of airplanes and their design and décor; finding and suggesting ideas for new products and product lines for the Menard stores, such as garden centers; scouting and proposing new store locations; proposing redesign of store layout and product displays; representing Menard, Inc., as a product buyer; reviewing and suggesting changes and additions to Menard, Inc., marketing plans; assisting with government and public relations; participating in the redesign of store signs and logo; helping find new business and investment opportunities; and assisting in the management of newly-acquired businesses, including two engine design companies in England, a thoroughbred racing business, and a $400 million private equity fund.

Sands contends Menard repeatedly promised to compensate her for her services by giving her "an ownership

interest in the various Menard business ventures for which she provided assistance." Menard denies making any such promises.

¶ 6. Sands contends she did not perform any legal work for Menard until 2003, over five years after their relationship began. Conversely, the Menard Defendants assert that Sands began providing legal services for Menard in October 1997, about one month before she and Menard began dating. Specifically, the Menard Defendants claim Sands was retained to provide legal services in connection with an investigation by the Wisconsin Department of Natural Resources (DNR) regarding Menard's disposal of wood ash.

¶ 7. The record reflects that, on or about May 28, 1998, the Prima Group, a company owned by Sands and her sister, sent Menard, Inc., an invoice for a "Client Matter" entitled "Wisconsin Dep't. of Natural Resources v. Menard, Inc." The invoice stated it was for "Governmental relations & Legal services rendered Oct. 15, 1997 – May 15, 1998." The total amount of the invoice was $49,635.84, which was comprised of a $35,000 retainer, $35.84 in "Disbursements," and $14,600 for "Gov't Relations & Legal Services." Menard, Inc., paid this invoice in full on May 29, 1998, and recorded the payment in its financial records as a legal expense.

¶ 8. Sands disputes that the May 29, 1998 payment was compensation for legal services. Instead, Sands contends that, in May 1998, Menard offered to give her money so that she could pay off an outstanding student loan in the amount of $49,635.84. According to Sands, Menard directed her to bill Menard, Inc., for the exact amount of the loan and to state the invoice was for government relations and legal services. Sands contends this was done so that the payment would be tax deductible by Menard, Inc., as a business expense.

136

¶ 9. In addition to the DNR/wood ash matter, the Menard Defendants contend Sands provided legal services to both Menard and Menard, Inc., beginning in September 1998 in a transaction involving race car driver Robby Gordon. Gordon's affidavit supports the Menard Defendants' claim. In addition, the record reflects that Menard, Inc., paid Sands $3,000 on September 21, 1999, and the Menard Defendants contend that payment was for her work on the Gordon transaction.

¶ 10. Sands concedes she performed "a small amount of work . . . in assisting with negotiation" of the Gordon transaction. However, she asserts her role in the transaction was "as [Menard's] business advisor, and not as his lawyer." Sands further claims she was never paid for her work on the Gordon transaction, and the $3,000 payment she received from Menard, Inc., was actually a reimbursement for wedding planning expenses.

¶ 11. The parties do agree, however, that by the year 2003 Sands had begun doing legal work for Menard and Menard, Inc. From May 2003 to June 2004, Sands sent Menard, Inc., seven invoices for a total of 1,049 hours of "legal services" provided between April 9, 2003 and June 7, 2004.[2] Sands billed at an hourly rate of $145, which she testified at deposition was "suggested, demanded, . . . approved" and "agreed" upon by

---

[2] Beginning in May 2003, all of the invoices Sands sent to Menard, Inc., bore the following header:

Debra K. Sands, Esq.
Attorney-at-Law

Each invoice also included the following description: "Professional fees in respect of legal services in acting on your behalf." None of the invoices dated May 2003 or later referred to the Prima Group.

Menard. Menard, Inc., paid Sands a total of $152,105 for the legal work reflected in the seven invoices.

¶ 12. Sands continued providing legal services for Menard and Menard, Inc., until her relationship with Menard ended in 2006. At that point, Menard instructed Sands to submit a bill for all legal services for which she had not been paid dating back to 2003. Sands then submitted 190 separate invoices to Menard, Inc., for work performed between February 2003 and April 2006. According to those invoices, Sands performed 7,487.10 hours of legal work during that time period, which, at a rate of $145 per hour, amounted to $1,085,629.50 in legal fees.

¶ 13. Sands met with Menard and Peter Liupakka, Menard, Inc.'s chief financial officer (CFO), in October 2006. During the meeting, Liupakka advised Sands he believed the number of hours reflected in her invoices was excessive. Menard, Inc., nevertheless offered to pay Sands $961,518—the amount claimed in the invoices, less payments Menard, Inc., believed Sands had already received. However, payment of that amount was conditioned on Sands signing a one-page "Release of All Claims," which expressly included a waiver of any "quasi-marital claims." Sands refused to sign the release. According to Sands, Menard then "said that he would add an additional $100,000 to the total of these invoices and [Liupakka] would go prepare the check as [she] sat there if [she] would sign the [r]elease." Sands again refused to sign. Because of Sands' refusal, Menard, Inc., declined to pay her any portion of the fees reflected in the 190 invoices she had submitted.

¶ 14. On November 3, 2008, Sands filed the instant lawsuit against the Menard Defendants and various other parties. Two weeks later, Sands filed an amended complaint dropping all of the additional de-

fendants except MH Private Equity Fund, LLC. A second amended complaint was filed on May 10, 2011, adding the Trustees as defendants. Among other things, the second amended complaint alleged that, in 2002, unbeknownst to Sands, Menard had transferred the vast majority of his non-voting stock in Menard, Inc., to the John R. Menard, Jr. 2002 Trust.

¶ 15. Sands' second amended complaint asserted claims for unjust enrichment, breach of contract, and promissory estoppel against Menard. As damages for those claims, Sands sought "a fair and reasonable share of the property, wealth, and increased net worth acquired by Menard through [Sands'] efforts" during their relationship, or damages equal to the fair value of the ownership interest Menard had allegedly promised her. The second amended complaint also asserted unjust enrichment claims against the other Menard Defendants and the Trustees, claiming in each case that Sands was entitled to "judgment in an amount equal to the fair and reasonable value of the substantial . . . benefits" she had provided. In response to Sands' second amended complaint, Menard, Inc., asserted a counterclaim against Sands for breach of fiduciary duty.[3]

¶ 16. In April 2012, the Menard Defendants moved for partial summary judgment, seeking dismissal of "all of [Sands'] claims by which she [sought] a portion of [Menard's] net worth or assets, ownership interests in the Menard companies, or any part of the increase in value of the Menard companies." (Some capitalization omitted.) The Menard Defendants argued, among other things, that Sands was barred from

[3] The Menard Defendants also asserted various other counterclaims against Sands. However, they have since abandoned those additional counterclaims, and, as a result, we need not discuss them further.

139

recovering a portion of Menard's assets or an ownership interest in his companies because she had failed to comply with the requirements of SCR 20:1.8(a) (hereinafter, Rule 1.8(a)), which regulates business transactions between attorneys and clients.[4] The Trustees also moved for summary judgment. They contended Sands' unjust enrichment claim against them failed as a matter of law because: (1) Sands did not allege she had provided any services to the Trustees; (2) Sands could not establish the value of her alleged contributions; and (3) the Trustees did not retain any benefit provided by Sands under inequitable circumstances.

¶ 17. Following a hearing, the circuit court granted both summary judgment motions. With respect to the Menard Defendants' motion, the court declined to adopt a bright-line rule that an attorney's claims against his or her client stemming from a business transaction with the client are necessarily barred if the attorney violated Rule 1.8(a). Instead, the court held that Rule 1.8(a) does not bar the attorney's claim if: (1) the attorney and client had a romantic relationship that predated their attorney-client relationship; and (2) the legal services rendered by the attorney were "merely ancillary or incidental" to the parties' larger joint enterprise.

---

[4] All references to SCR 20:1.8(a) are to the 1997 version, which was in effect when Sands and Menard began their relationship and when, according to the Menard Defendants, Sands first performed legal work for Menard. The rule remained unchanged until 2007, after Sands' relationship with Menard ended. *Compare* SCR 20:1.8(a) (1997), *and* SCR 20:1.8(a) (2006), *with* SCR 20:1.8(a) (2007); *see also* SUP. CT. ORDER 04–07, 293 Wis. 2d xv, xv-xvii, lx (eff. July 1, 2007).

¶ 18. Applying the first prong of this test, the circuit court focused on whether the May 28, 1998 invoice from the Prima Group to Menard, Inc., for "legal services" rendered between October 15, 1997, and May 15, 1998, established that Sands' attorney-client relationship with Menard preceded their romantic relationship. The court noted that, for purposes of summary judgment, it was required to accept as true Sands' claim—which the court referred to as "quite a tale"—that the invoice was

> a fraudulent document she submitted to Menard, Inc., so that a personal gift from John R. Menard, Jr., to Debra Sands to pay her student loans could be run through his company and, with the magic of fraud, transforms a taxable event under the gift tax to a tax deductible event as a business expense, albeit a tax shifting event to Sands as income.

Even accepting Sands' claim regarding the invoice as true, however, the court stated it would deny Sands relief in equity because her admitted fraud regarding the invoice was evidence of unclean hands and showed she was *in pari delicto*[5] with Menard. The court therefore refused to "ignor[e]" the invoice, which, according to the court, showed that Sands had an attorney-client relationship with Menard before their romantic relationship began.

¶ 19. Applying the second prong of the test stated above, the circuit court noted the record contained "invoices . . . approaching one million dollars covering eight years' period, which is, on average, . . . over a

---

[5] *In pari delicto* is a Latin phrase meaning "in equal fault." BLACK'S LAW DICTIONARY 911 (10th ed. 2014). The *in pari delicto* doctrine refers to "[t]he principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Id.*

hundred thousand dollars a year." The court stated that amount of legal services was "certainly not . . . ancillary, much less incidental." Because the court concluded neither prong of the test it had formulated was met, it ruled Sands' violation of Rule 1.8(a) barred her claims against the Menard Defendants for an ownership interest in Menard's businesses or for a portion of the increase in their value.

¶ 20. The circuit court then held that, "since there [was] no avenue to recover against the Menard principal," Sands could not recover from the Trustees. Accordingly, the court granted the Trustees' motion for summary judgment. The court stated that, following these rulings, Sands' only remaining claim was her claim "against [the Menard Defendants] for compensation for services rendered."

¶ 21. The circuit court subsequently entered written orders granting summary judgment to the Trustees and partial summary judgment to the Menard Defendants. Sands appealed as of right from the order regarding the Trustees and petitioned for leave to appeal from the order regarding the Menard Defendants. On December 27, 2012, we denied Sands' motion for leave to appeal the order regarding the Menard Defendants; however, we stayed Sands' appeal of the order regarding the Trustees pending the disposition of her remaining claims in the circuit court.

¶ 22. Thereafter, in the circuit court, Sands submitted a thirty-seven page list of "nonlegal" services for which she alleged she was entitled to be compensated. Among other things, Sands sought compensation for selecting and purchasing furniture for Menard's residences, planning and preparing meals, managing and coordinating Menard's medical care, assisting with gardening and lawn mowing, providing "personal . . . and

142

family advice," and advising Menard regarding various aspects of his businesses. The Menard Defendants moved to strike Sands' claim for nonlegal services on several grounds, including that Sands had previously averred in an affidavit that she never expected to be compensated for her nonlegal services. The circuit court granted the Menard Defendants' motion to strike, finding Sands had previously admitted she had no expectation of compensation for her nonlegal services. Sands does not challenge that ruling on appeal.

¶ 23. After the circuit court struck Sands' claim for nonlegal services, the Menard Defendants sought an admission from Sands that her only remaining claim was "for the legal services that she rendered to the Menard Defendants at $145 per hour." However, Sands refused to admit that fact, instead asserting, apparently for the first time, that she was entitled to the *quantum meruit*[6] value of her legal services, which she claimed was between $355 and $640 per hour. After multiplying those hourly rates by 6,779.25 hours—the number of hours for which Sands claimed she had not yet been paid—Sands asserted she was entitled to damages of between $2,406,633.75 and $4,338,720.

¶ 24. The Menard Defendants moved to strike Sands' *quantum meruit* claim, arguing she could not recover on a quasi-contract theory when she had an express contract with Menard to be paid $145 per hour for her legal services. The circuit court agreed with the Menard Defendants and granted their motion to strike the *quantum meruit* claim, explaining:

---

[6] Latin for "as much as he has deserved," *quantum meruit* refers to "[t]he reasonable value of services; damages awarded in an amount considered reasonable to compensate a person who has rendered services in a quasi-contractual relationship." BLACK'S LAW DICTIONARY, *supra,* at 1437.

143

> All the invoices in this case generated by [Sands] show the rate of $145 per hour. Even if this sum was dictated by the client, Mr. Menard, this was clearly the agreed rate. [Sands] claims that Mr. Menard repudiated the contract and thus the contract amount when he refused to pay the amount without there being the signature of a general release. Refusal to pay when the services have been fully performed is not a repudiation of the contract, it is rather a breach of the contract.

Sands does not challenge this ruling on appeal.

¶ 25. In the meantime, Sands moved for summary judgment on Menard Inc.'s counterclaim for breach of fiduciary duty. The circuit court ultimately granted that motion, concluding the counterclaim was barred by the applicable statute of limitations.

¶ 26. Thus, the only remaining claim before the circuit court was Sands' claim that Menard had breached an express contract to pay her $145 per hour for legal services. On March 27, 2015, Sands moved the circuit court to dismiss that claim with prejudice and enter a final judgment so that she could pursue an appeal of the court's previous order granting the Menard Defendants partial summary judgment. The court granted Sands' motion, and a final order was entered on April 8, 2015, disposing of the entire matter in litigation with respect to all the parties.

¶ 27. On April 24, 2015, Sands filed a notice of appeal from the circuit court's April 8, 2015 final order. Menard, Inc., cross-appealed from the order dismissing its counterclaim for breach of fiduciary duty. Sands moved to consolidate her appeal from the April 8 order with her previous appeal from the order granting summary judgment to the Trustees. We granted that motion on June 15, 2015. Additional facts are included in the discussion section as necessary.

## DISCUSSION

¶ 28. We review a grant of summary judgment independently, using the same methodology as the circuit court. *Hardy v. Hoefferle*, 2007 WI App 264, ¶ 6, 306 Wis. 2d 513, 743 N.W.2d 843. Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2).[7] The burden is on the party seeking summary judgment to demonstrate "the absence of any genuine factual disputes and entitlement to judgment as a matter of law under the legal standards applicable to the claim." *Steven V. v. Kelley H.*, 2004 WI 47, ¶ 35, 271 Wis. 2d 1, 678 N.W.2d 856. We review summary judgment materials in the light most favorable to the nonmoving party. *Thomas v. Mallett*, 2005 WI 129, ¶ 4, 285 Wis. 2d 236, 701 N.W.2d 523.

## I. Sands' appeal

### A. *Sands' claims against the Menard Defendants*

¶ 29. In her second amended complaint, Sands asserted claims for unjust enrichment against all three of the Menard Defendants. In addition, she asserted breach of contract and promissory estoppel claims against Menard only. The Menard Defendants contend the circuit court properly granted summary judgment on all of these claims, to the extent they were premised on legal services Sands provided during her relationship with Menard, because the undisputed facts show

---

[7] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

that Sands violated Rule 1.8(a), which governs business transactions between attorneys and clients. The Menard Defendants contend Sands' violation of Rule 1.8(a) is a complete bar to any claim that Sands is entitled to an ownership interest in Menard's businesses based on legal services she provided.

¶ 30. During the time period relevant to this case, Rule 1.8(a) provided:

> A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to the client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>
> (3) the client consents in writing thereto.

These requirements are necessary because "[a] lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a business, property or financial transaction with a client." MODEL RULES OF PROF'L CONDUCT r. 1.8 cmt. (AM. BAR ASS'N 2015). This includes transactions, like the one Sands alleges here, in which an attorney seeks an ownership interest in the client's business as compensation for legal services. *See id.* ("[Rule 1.8(a)] does not apply to ordinary fee arrangements between client and lawyer, which are governed

by Rule 1.5, although its requirements must be met when the lawyer accepts an interest in the client's business or other nonmonetary property as payment of all or part of a fee.").

¶ 31. Sands argues Rule 1.8(a) does not apply to her because she did not have an attorney-client relationship with Menard at the time he agreed to give her an ownership interest in his businesses as compensation for her services. Sands contends she did not begin performing legal work for any of the Menard Defendants until 2003. Although the Menard Defendants claim Sands acted as Menard's attorney in 1997 and 1998 in conjunction with the DNR/wood ash matter and the Robby Gordon transaction, Sands contends there are disputed issues of material fact regarding whether she provided legal services in those matters.

¶ 32. The Menard Defendants argue Sands judicially admitted, in her second amended complaint, that she provided legal services to Menard throughout their entire relationship.[8] Regardless of whether Sands judicially admitted to providing legal services to Menard throughout their relationship, we conclude Rule 1.8(a) applies to the conduct at issue in this case. In the second amended complaint, Sands clearly alleged that she provided nonlegal services to the Menard Defendants prior to 2003. However, the circuit court con-

---

[8] Judicial admissions are "formal statements in stipulations or pleadings which are created in the course of proceedings in an action." TED M. WARSHAFSKY & FRANK T. CRIVELLO II, 11 WIS. PRACTICE SERIES: TRIAL HANDBOOK FOR WIS. LAWYERS § 18:02 (3d ed. 2005). A judicial admission is "conclusive on the party making it" and "forecloses the admitter from contradicting the admission." *Id.*

cluded Sands could not recover for any nonlegal services because she conceded she never expected to be compensated for them. Sands does not challenge that ruling on appeal. Thus, Sands is barred from seeking compensation for nonlegal services provided at any time during her relationship with Menard. To the extent Sands seeks compensation for legal services, whenever provided, based upon the alleged representation by Menard that he would give Sands an ownership interest in his businesses in exchange for her services, whenever that representation was alleged to have been made, Sands had an attorney-client relationship with Menard and was subject to the requirements of Rule 1.8(a). Consequently, any arrangement for Sands to acquire an interest in Menard's businesses in exchange for her legal services required her to comply with Rule 1.8(a)'s requirements.

¶ 33. Having concluded that Sands was required to comply with Rule 1.8(a) in order to receive an ownership interest in Menard's businesses in exchange for her legal services, we note it is undisputed that Sands violated the rule. Sands affirmatively alleges that she entered into an agreement to provide legal services to Menard in exchange for an interest in his businesses, and she does not dispute that she failed to provide the disclosures required by Rule 1.8(a) and to obtain Menard's written consent to the transaction. Nevertheless, Sands argues her violation of Rule 1.8(a) does not bar her claims against the Menard Defendants because violations of the Rules of Professional Conduct can only be considered in attorney disciplinary proceedings.

¶ 34. In support of this assertion, Sands cites the preamble to the Rules of Professional Conduct, which states, in relevant part:

Violation of a rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such duty.

SCR ch. 20, Preamble: A Lawyer's Responsibilities, Scope (1997).

¶ 35. Sands also cites *Foley-Ciccantelli v. Bishop's Grove Condominium Association*, 2011 WI 36, 333 Wis. 2d 402, 797 N.W.2d 789, which addressed the proper standard for deciding a motion to disqualify an opposing party's attorney based on a conflict of interest. *Id.*, ¶¶ 20, 26, 81. In resolving that question, our supreme court stated:

> The circuit court concluded that the plaintiffs' law firm did not engage in any unethical conduct of any kind. The instant case is not a determination of unethical conduct. *Violations of the Code of Professional Conduct are determined only by means of disciplinary action.* This is a disqualification proceeding, not a disciplinary proceeding.

*Id.*, ¶ 2 (emphasis added).

¶ 36. Finally, Sands cites three additional cases for the proposition that violations of the Rules of Pro-

fessional Conduct do not provide a basis for civil liability or create a presumption that a legal duty has been breached. *See Industrial Roofing Servs. v. Marquardt,* 2007 WI 19, ¶ 68 n.14, 299 Wis. 2d 81, 726 N.W.2d 898; *Williams v. Rexworks, Inc.,* 2004 WI App 228, ¶ 20, 277 Wis. 2d 495, 691 N.W.2d 897; *Nauga, Inc. v. Westel Milwaukee Co.,* 216 Wis. 2d 306, 318 n.5, 576 N.W.2d 573 (Ct. App. 1998).

¶ 37. Contrary to Sands' assertion, the preamble to the Rules of Professional Conduct and the cases cited above do not establish that the Rules of Professional Conduct can never be considered outside the attorney disciplinary context. In fact, the preamble was amended in 2007 to add the following concluding sentence to the paragraph quoted above: "Nevertheless, since the rules do establish standards of conduct by lawyers, a lawyer's violation of a rule may be evidence of breach of the applicable standard of conduct." SUP. CT. ORDER 04–07, 293 Wis. 2d xv, xxii (eff. July 1, 2007). Furthermore, although the *Foley-Ciccantelli* court initially stated violations of the Rules of Professional Conduct could be determined only by means of disciplinary action, *see Foley-Ciccantelli,* 333 Wis. 2d 402, ¶ 2, the court went on to hold that the Rules can be considered in determining whether an attorney should be disqualified because the Rules "provide principles for an attorney's duties to former and current clients." *Id.,* ¶ 91. The court explained that Wisconsin courts "have often cited the Rules of Professional Conduct for guidance in non-disciplinary cases, including disqualification cases." *Id.,* ¶ 86.

¶ 38. With these principles in mind, we conclude Sands' undisputed violation of Rule 1.8(a) barred her equitable claims against the Menard Defendants—that

is, her unjust enrichment claims against all three Menard Defendants and her promissory estoppel claim against Menard.[9] It is axiomatic that a party seeking to recover in equity must come to court with clean hands. *See Zinda v. Krause*, 191 Wis. 2d 154, 174, 528 N.W.2d 55 (Ct. App. 1995).

> Equity imperatively demands of suitors in its courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. He who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice, or unfairness, will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly "within the law." Misconduct which will bar relief in a court of equity need not necessarily be of such nature as to be punishable as a crime or to constitute the basis of legal action. Under this maxim, any wilful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean.

*David Adler & Sons Co. v. Maglio*, 200 Wis. 153, 160, 228 N.W. 123 (1929) (quoting *Weegham v. Killefer*, 215 F. 168, 171 (W.D. Mich. 1914)).

¶ 39. Here, Rule 1.8(a) sets forth a standard of conduct with which an attorney must comply when entering into a business transaction with his or her client. If, as Sands alleges, she entered into a business transaction with Menard by which she agreed to per-

---

[9] As noted above, the circuit court concluded Rule 1.8(a) barred Sands' claims if: (1) her attorney-client relationship with Menard predated their romantic relationship; and (2) the legal services she provided were "merely ancillary or incidental" to the parties' larger joint enterprise. The court did not, however, cite any legal authority in support of this two-factor test. We therefore decline to adopt it.

form legal services for him in exchange for an interest in his businesses, Sands was required to comply with Rule 1.8(a). It is undisputed that Sands failed to comply with the rule. By doing so, Sands committed a willful act that would be "condemned and pronounced wrongful by honest and fair-minded men." *See David Adler & Sons,* 200 Wis. at 160. As such, Sands' hands are unclean, and her violation of Rule 1.8(a) therefore bars her from recovering on her equitable claims.

¶ 40. Sands raises several arguments in attempt to save her equitable claims. First, she argues Menard waived his right to raise her violation of Rule 1.8(a) as a defense by ratifying their agreement after the violation occurred. Sands cites three cases in support of this proposition.[10] *See DiLuglio v. Providence Auto Body, Inc.,* 755 A.2d 757 (R.I. 2000); *Milo Fields Trust v. Britz,* 874 A.2d 1130 (N.J. Super. Ct. App. Div. 2005); *Murdock v. Nalbandian,* Nos. 218–2008–CV-1062, 218–2009–EQ-0031, 2010 WL 8484210 (N.H. Super. Ct. Oct. 26, 2010).

¶ 41. Assuming without deciding that Menard performed acts sufficient to constitute ratification,[11] we nevertheless reject Sands' ratification argument. None of the foreign cases Sands cites involved a client attempting to use an attorney's violation of Rule 1.8(a) as a defense to the client's equitable claims against the attorney. Because none of those cases involved equi-

---

[10] Sands also cites a fourth case. *See Twachtman v. Hastings,* No. CV 9557307S, 1997 WL 433878 (Conn. Super. Ct. July 23, 1997). However, *Twachtman* does not discuss waiver or ratification.

[11] Sands contends Menard ratified his promise to give her a share of his businesses by "repeat[ing]" that promise throughout their relationship; she does not contend that any such agreement was ever reduced to writing.

152

table claims, but rather contract claims, they did not address whether an attorney's violation of Rule 1.8(a) rendered the attorney's hands unclean and therefore prevented the attorney from pursuing equitable claims against the client. Here, in contrast, we have concluded Sands' hands are unclean due to her Rule 1.8(a) violation, and she is therefore precluded from recovering on her equitable claims. Sands cites no authority for the proposition that Menard's alleged ratification of the underlying transaction was sufficient to show the safeguards required when an attorney enters into an arrangement with a client to obtain an interest in the client's businesses were met. Absent such a showing, Menards' alleged ratification cannot cleanse Sands' unclean hands, thus permitting her to recover in equity.

¶ 42. Sands also argues Rule 1.8(a) does not apply to an unjust enrichment claim brought under *Watts*. In *Watts*, the plaintiff (Sue Ann) and defendant (James) lived together for twelve years, during which time they had two children together and held themselves out to the public as husband and wife. *Watts*, 137 Wis. 2d at 513. Sue Ann contributed childcare and homemaking services to the relationship, as well as personal property. *Id.* She also worked at James' business and at a separate business she started with his sister-in-law. *Id.* at 514. After the parties' romantic relationship ended, James "refused to share equally with [Sue Ann] the wealth accumulated through their joint efforts or to compensate her in any way for her contributions to the relationship." *Id.* Sue Ann therefore sued James, asserting several grounds for relief.

¶ 43. On appeal, our supreme court rejected Sue Ann's argument that she was entitled to a division of property under the statutes governing the disposition of

153

property at divorce. *Id.* at 519–20. The court also rejected Sue Ann's claim that James was estopped from asserting their lack of a legal marriage as a defense against Sue Ann's claim for property division under the divorce statutes. *Id.* at 520–21. However, the court concluded the circuit court had improperly dismissed Sue Ann's remaining claims for breach of an express or implied contract, unjust enrichment, and partition. *Id.* at 528–29, 533, 537. With respect to the unjust enrichment claim, the court rejected James' argument that it should "leave the parties to an illicit relationship such as the one in this case essentially as they are found, providing no relief at all to either party." *Id.* at 532. Instead, the court held that "unmarried cohabitants may raise claims based upon unjust enrichment following the termination of their relationships where one of the parties attempts to retain an unreasonable amount of the property acquired through the efforts of both." *Id.* at 532–33.

¶ 44. Sands argues *Watts* affirms her right to bring an unjust enrichment claim against Menard.[12] However, unlike Sands, the plaintiff in *Watts* was not an attorney and was therefore not subject to the requirements of Rule 1.8(a). There is no exception to Rule 1.8(a) for attorneys who cohabitate with their clients, and we decline Sands' invitation to read *Watts* as establishing such an exception. Sands' own pleadings allege that she entered into an arrangement with Menard, her client, by which she provided legal ser-

[12] Sands frequently refers to her unjust enrichment claim as a "*Watts* claim." However, *Watts v. Watts*, 137 Wis. 2d 506, 405 N.W.2d 303 (1987), did not create a new cause of action for unmarried cohabitants. It merely recognized that such parties are not barred from asserting existing legal or equitable claims by virtue of their cohabitation. *See, e.g., id.* at 532.

vices in exchange for a promise that Menard would give her a share of his businesses. This situation falls squarely within the parameters of Rule 1.8(a), and Sands was therefore required to comply with the rule's requirements.

¶ 45. Sands next asserts the ownership interests she sought to acquire were not "adverse" to her client. *See* SCR 20:1.8(a) ("A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest *adverse to* a client unless . . . ." (emphasis added)). However, Sands' own pleadings belie this assertion. According to Sands' second amended complaint, she provided legal services to both Menard and his businesses "in reliance on the promises and representations of Menard . . . to compensate her with an ownership interest for her contributions to the increase in the net worth of Menard and his various business interests." If Sands succeeded in gaining either an ownership interest in Menard's businesses or the economic equivalent in damages, that result would clearly be adverse to Menard because Sands' gain would be Menard's loss.

■

¶ 46. Finally, Sands claims that barring her unjust enrichment claim in this case would mean that no lawyer could ever bring an unjust enrichment claim under *Watts* against a former cohabitant. However, that is not the case. We merely hold that an attorney cannot bring an unjust enrichment claim under *Watts* to recover an ownership interest in a former cohabitant's business (or equivalent damages) as compensation for legal services, unless the attorney complied with Rule 1.8(a). Our holding in this case does not address other circumstances in which an attorney might attempt to

bring an unjust enrichment claim under *Watts*—for instance, a circumstance in which the attorney provided only nonlegal services to a joint enterprise with a cohabitant, or a circumstance in which the attorney contributed to a joint enterprise the salary he or she earned while working at a law firm on unrelated matters.

¶ 47. Having concluded that Sands' violation of Rule 1.8(a) bars her equitable claims against the Menard Defendants, we turn to Sands' claim that Menard breached a contract with her by failing to give her an ownership interest in his companies as compensation for her legal services. Assuming without deciding that Sands' failure to comply with Rule 1.8(a) does not bar her breach of contract claim, or that Menard waived his right to assert the rule violation as a defense by ratifying the parties' transaction, we nevertheless conclude the claim was properly dismissed because it was insufficiently pled.

¶ 48. "A contract must be definite and certain as to its basic terms and requirements to be enforceable." *Metropolitan Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 22, 291 Wis. 2d 393, 717 N.W.2d 58, *opinion clarified on denial of reconsideration,* 2007 WI 23, 299 Wis. 2d 174, 727 N.W.2d 502. "Indefiniteness means that an essential term of the agreement is so vague or indefinite that that agreement is not 'definite as to the parties' basic commitments and obligations,' thus preventing the formation of a contract." *Ehlinger v. Hauser,* 2008 WI App 123, ¶ 28, 313 Wis. 2d 718, 758 N.W.2d 476 (quoting *Management Comput. Servs. Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996)). Indefiniteness is not synonymous with ambigu-

ity. *Id.* "[W]hereas ambiguity in itself does not render a contract unenforceable, indefiniteness does." *Id.*

¶ 49. Here, Sands' second amended complaint simply alleges that Menard

> repeatedly promised, agreed, and represented to Sands that, in consideration for Sands's assistance, advice, and efforts on behalf of Menard and his various business interests and entities, Menard would compensate Sands with an ownership interest for her contributions to the acquisition of property, wealth, and the increase in his net worth and the net worth of his various business[es].

The complaint does not identify the amount or value of the ownership interest Menard agreed to give Sands, or even in which entity or entities he agreed to give her an ownership interest. It therefore fails to identify with specificity the consideration Menard allegedly promised Sands in exchange for her services. Without this essential term, Sands has failed to allege a valid and enforceable contract. Accordingly, her breach of contract claim against Menard was properly dismissed. *See Trinity Ev. Luth. Church & Sch.-Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶ 32, 261 Wis. 2d 333, 661 N.W.2d 789 ("[T]he first step in the summary judgment review analysis is to determine whether the pleadings set forth a claim of relief.").

### B. Sands' claim against the Trustees

¶ 50. Sands also appeals the circuit court's order dismissing her unjust enrichment claim against the Trustees. Sands' second amended complaint alleged that Sands, through her work for Menard and his businesses, "conferred substantial benefits" on the Trustees "in their representative capacity" as trustees of

the John R. Menard, Jr. 2002 Trust; that the Trustees were aware of the substantial benefits; and that the Trustees "accepted and retained the substantial benefits . . . under circumstances making it inequitable to retain those benefits without payment of their value." Sands therefore alleged she was entitled to "judgment in an amount equal to the fair and reasonable value of the substantial benefits" she provided.

¶ 51. The circuit court granted the Trustees summary judgment based on its earlier ruling granting partial summary judgment to the Menard Defendants. The court reasoned, "[S]ince there is no avenue to recover against the Menard principal, there cannot be recovery against the [Trustees]." On appeal, Sands does not challenge the court's conclusion that, if her claims against the Menard Defendants were properly dismissed, dismissal of her claim against the Trustees was also required. In fact, in her brief-in-chief, Sands' entire argument regarding the order granting summary judgment to the Trustees is as follows:

> The [c]ircuit [c]ourt entered summary judgment for the Trustees solely because it granted summary judgment for the Menard Defendants. Because the Menard Order must be reversed, then so must the Trustee Order granting summary judgment for the Trustees.

In her reply brief, Sands similarly fails to dispute the circuit court's conclusion that dismissal of her claims against the Menard Defendants necessitated dismissal of her claim against the Trustees.

■■■■

¶ 52. Failure to address the grounds on which the circuit court ruled constitutes a concession of the ruling's validity. *Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994); *see also Industrial Risk*

158

*Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶ 25, 318 Wis. 2d 148, 769 N.W.2d 82 ("[W]e will not abandon our neutrality to develop arguments" for the parties.). Here, we have already concluded the circuit court properly dismissed Sands' claims against the Menard Defendants, and Sands does not challenge the circuit court's ruling that dismissal of her claims against the Menard Defendants was fatal to her claim against the Trustees. We therefore affirm the order dismissing Sands' unjust enrichment claim against the Trustees.

## II. Menard, Inc.'s cross-appeal

¶ 53. In a cross-appeal, Menard, Inc., argues the circuit court erred by granting Sands summary judgment on its counterclaim for breach of fiduciary duty. Specifically, Menard, Inc., contends Sands breached her fiduciary duties while representing Menard, Inc., in a transaction involving the formation of MH Private Equity Fund, LLC (the Fund).

### A. *Factual background*

¶ 54. It is undisputed that Sands acted as outside legal counsel for Menard, Inc., from at least January 2005 until October 2005 in connection with the Fund's formation. As part of the transaction, Menard, Inc., created a wholly-owned subsidiary known as Merchant Capital, LLC, which ultimately invested more than $300 million in the Fund. The Fund was managed by MH Equity Managing Member, LLC (MH Equity), a company owned by Stephen Hilbert and his wife. As Menard, Inc.'s attorney, Sands negotiated the terms of the Fund transaction with Stephen Hilbert, who was a personal friend of Menard. She also reviewed, edited,

and drafted the necessary legal documents. Sands later billed Menard, Inc., for 753.75 hours of legal services in connection with the Fund transaction. At Sands' hourly rate of $145, this amounted to $109,239.75 in legal fees.

¶ 55. Menard, Inc., asserts Sands breached her fiduciary duties in three primary ways with respect to the Fund transaction. First, Menard, Inc., asserts that, during her negotiations with Hilbert, Sands attempted to obtain a twenty-percent ownership interest in the entity created to manage the Fund. The record shows that, on March 11, 2005, Sands received an email from Hilbert attaching draft documents regarding the Fund's formation, including a "Subscription Agreement" through which Sands would purchase 30,000 shares in TH Investment, LLC, a Hilbert-owned entity that was a forerunner of MH Equity. Another document in the record, a draft of the "Summary of Selected Terms and Conditions" for the Fund, showed Sands as having a twenty-percent interest in MH Equity.[13]

¶ 56. Menard, Inc., also contends Sands breached her fiduciary duties by "bec[oming] an advocate for the Fund transaction and disclos[ing] confidential information to Hilbert to ensure the transaction would close." It is undisputed that a meeting was scheduled for September 1, 2005, to negotiate the final terms of the Fund transaction. The day before the meeting, Sands sent Hilbert an email that stated, in relevant part:

---

[13] Sands never actually obtained an ownership interest in MH Equity. Hilbert testified at deposition that he refused to provide Sands an ownership interest in MH Equity because doing so would have been a "conflict [due to her representation of] John [Menard]." Sands contends she did not receive an ownership interest primarily because she was not an "accredited investor," but also because she did not want to be "in a position where it could be construed as any kind of conflict of interest."

160

Bob brought up the issue of board approval today. Obviously, John [Menard] should have approval for this undertaking, but as you and I know, board approval for him is a minor formality. Since he is 90% Maj SH (and the others are his kids) it is really a moot point. He is THE decision maker and it wouldn't be the first deal that was approved post-signing. So, if he uses that as a stall – I would push him a bit, at least try to get the signature – maybe date it out a week in order for him to "document" approval.

Despite our concerns over funding – I think we should be very careful not to raise this issue with him. Let's see if we can get everything in place first. It isn't something he has thought about and I'd rather he didn't think too much about it. It's best if he "feels" that this is a "Menard" deal and obligation—which he does.

I would play to the idea that the financial strength of the Fund and its backing by Menards gives it a tremendous advantage in the market and the ability to attract the best deals. He'll like that and it's true and it will make him want to make sure the Fund is strong. He's proud of his financial strength and he wants only to be associated with "winners". The only thing he probably hates more than actually losing money is for others to know he has made a bad investment and is losing money . . . .

¶ 57. The parties met the next day as scheduled. During the meeting, accountant Joseph Stienessen and Menard, Inc.'s CFO, Peter Liupakka, counseled against going forward with the transaction. Sands then began advocating strongly in favor of the transaction and, according to Menard, Inc., falsely informed Menard he was legally obligated to proceed. In response, Menard asked Sands, "[W]hose side are you on?" and queried whether he "should get different counsel to represent him." Despite his misgivings, Menard went forward

161

with the Fund transaction. Sands later asserted that she was "responsible for saving the deal."

¶ 58. Finally, Menard, Inc., asserts Sands breached her fiduciary duties by accepting certain payments from Hilbert without disclosing them to Menard, Inc. Menard, Inc., notes that, on October 6, 2005, approximately one month after the transaction closed, Sands received a check for $15,000 from the "Stephen C. Hilbert Trust." At her deposition, Sands described that payment as a "bonus." The record also shows that, after the Fund transaction closed, Sands was named general counsel of the Fund. From September 2005 until February 2007, she received $180,000 for her work as general counsel.

¶ 59. As discussed above, after Sands filed the instant lawsuit, Menard, Inc., filed a counterclaim against her for breach of fiduciary duty on January 15, 2009. Sands later moved for summary judgment on the counterclaim, asserting it was barred by the two-year statute of limitations in Wis. Stat. § 893.57 (2007–08).[14]

---

[14] At all times relevant to this case, Wis. Stat. § 893.57 set forth a two-year statute of limitations for intentional tort claims. *See* § 893.57 (2007–08); *see also Zastrow v. Journal Commc'ns, Inc.*, 2006 WI 72, ¶¶ 35–40, 291 Wis. 2d 426, 718 N.W.2d 51 (breach of fiduciary duty is an intentional tort). The statute was subsequently amended to provide a three-year limitations period. *See* 2009 Wis. Act 120, § 1. The three-year limitations period "first applie[d] to injuries occurring on" the act's effective date—February 26, 2010. *See id.*, § 2; *see also* Wis. Stat. § 991.11 (unless otherwise specified, the effective date of an act is the day after publication). It is undisputed that any breach of Sands' fiduciary duties with respect to the Fund transaction occurred before February 26, 2010; accordingly, the two-year statute of limitations in § 893.57 (2007–08), applies. As a result, all further references to § 893.57 in this opinion are to the 2007–08 version.

The circuit court agreed and granted Sands summary judgment on the counterclaim. Menard, Inc., cross-appeals from that order.[15]

## B. Analysis

¶ 60. On appeal, it is undisputed that Menard, Inc.'s counterclaim for breach of fiduciary duty was subject to the two-year statute of limitations in WIS. STAT. § 893.57. It is also undisputed that, under WIS. STAT. § 893.14, the filing of Sands' complaint on November 3, 2008, tolled the statute of limitations on the counterclaim.[16] The operative issue is therefore whether Menard, Inc.'s counterclaim accrued prior to November 3, 2006. If it did, the claim is barred by the two-year statute of limitations in § 893.57, and the circuit court properly granted Sands summary judgment.

---

[15] During the circuit court proceedings, Menard, Inc., was granted leave to amend its breach of fiduciary duty counterclaim to add Merchant Capital as a counterclaim plaintiff. However, Merchant Capital did not file a notice of appeal from the order granting Sands summary judgment on the counterclaim, and we therefore do not discuss it further.

[16] WISCONSIN STAT. § 893.14 provides, in relevant part:

Unless otherwise specifically prescribed by law, the period within which a cause of action may be used as a defense or counterclaim is computed from the time of the accrual of the cause of action until the time that the plaintiff commences the action in which the defense or counterclaim is made.

We have previously explained that this language tolls a statute of limitations applicable to a defendant's counterclaim beginning on the date the plaintiff files his or her complaint. *See Donaldson v. West Bend Mut. Ins. Co.*, 2009 WI App 134, ¶¶ 12, 24, 321 Wis. 2d 244, 773 N.W.2d 470.

¶ 61. "It is well settled that a cause of action accrues when there exists a claim capable of enforcement, a suitable party against whom it may be enforced, and a party with a present right to enforce it." *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 315, 533 N.W.2d 780 (1995). Sands argues that, with respect to Menard, Inc.'s counterclaim, these elements were fully satisfied as of September 1, 2005, the date on which the Fund transaction was finalized. Menard, Inc., does not dispute Sands' contention that these elements were satisfied as of September 1, 2005. Instead, Menard, Inc., argues its counterclaim was nevertheless timely pursuant to the discovery rule.

¶ 62. Our supreme court adopted the discovery rule in *Hansen v. A.H. Robins, Inc.*, 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983), for "all tort actions other than those already governed by a legislatively created discovery rule." The rule provides that such tort claims "shall accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first." *Id.* The discovery rule, as adopted in *Hansen*, balances "the threat of stale or fraudulent actions against the injustice of barring meritorious claims before the claimant knows of the injury." *Dakin v. Marciniak*, 2005 WI App 67, ¶ 14, 280 Wis. 2d 491, 695 N.W.2d 867.

¶ 63. Sands contends the undisputed facts show that Menard, Inc., had enough information as of September 1, 2005, that it should have, with reasonable diligence, discovered Sands' alleged breach of her fidu-

164

ciary duties.[17] Reasonable diligence "means such diligence as the great majority of persons would use in the same or similar circumstances." *Awve v. Physicians Ins. Co.*, 181 Wis. 2d 815, 823, 512 N.W.2d 216 (Ct. App. 1994). "Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach." *Spitler v. Dean*, 148 Wis. 2d 630, 638, 436 N.W.2d 308 (1989). "[I]n an appropriate case, an initial suspicion may trigger the discovery or the obligation to exercise reasonable diligence to discover the injury." *Goff v. Seldera*, 202 Wis. 2d 600, 611, 550 N.W.2d 144 (Ct. App. 1996). "When the material facts are undisputed and only one inference can reasonably be drawn, whether a plaintiff exercise[d] reasonable diligence in the discovery of an injury is a question of law." *Dakin*, 280 Wis. 2d 491, ¶ 14.

¶ 64. We agree with Sands that, as of September 1, 2005, Menard, Inc., had enough information that it should have, with reasonable diligence, discovered the alleged breach of Sands' fiduciary duties. Menard, the president and CEO of Menard, Inc., conceded at deposition that he had formed a belief as early as 2004 that Sands and Hilbert were "increasingly close, and it was very difficult to tell whose side [Sands] was on, was she on [Hilbert's] side or my side." Menard further testified he believed at that time that Sands was lying to him, and he did not think she was protecting his interests.

---

[17] Sands also suggests, in a footnote, that the discovery rule may not apply to a claim for breach of fiduciary duty. However, Sands fails to develop an argument in support of this assertion, and we therefore decline to address it. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals need not address undeveloped arguments).

¶ 65. With respect to the Fund transaction, Menard testified that, by the time the September 1, 2005 meeting occurred, he suspected that Sands, her sister, and Hilbert were conspiring against him. During that meeting, Menard openly questioned Sands' loyalty to him, asking her, "[W]hose side are you on?" and querying whether he "should get different counsel to represent him." Menard conceded in his deposition testimony that he discussed his concerns about Sands' loyalty with both Stienessen and Liupakka before finalizing the Fund transaction.

¶ 66. The only reasonable conclusion that can be drawn from these undisputed facts is that, as of September 1, 2005, Menard, Inc. had suspicions about Sands' loyalty that would have been significant enough to prompt a reasonable person in Menard, Inc.'s position to investigate further. Menard, Inc., however, chose not to do so. By doing nothing in the face of these suspicions, Menard, Inc., failed to exercise reasonable diligence to discover the alleged breach of Sands' fiduciary duties. *C.f. id.*, ¶ 18 ("Speculation after the fact about why an investigation might have failed does not alter the fact that [plaintiff] never attempted any investigation . . . . [Plaintiff] simply did nothing that might have produced more information and we conclude that, in this case, doing nothing was not an exercise of reasonable diligence.").

¶ 67. Menard, Inc., argues its mere suspicions regarding Sands were insufficient to trigger its obligation to exercise reasonable diligence. However, as noted above, an initial suspicion may in some cases be enough to trigger a plaintiff's duty to investigate. *Goff*, 202 Wis. 2d at 611. For instance, in *KDC Foods, Inc. v. Gray, Plant, Mooty, Mooty & Bennett, P.A.*, 763 F.3d 743 (7th Cir. 2014), KDC Foods asserted fraud and conspiracy

claims against its former law firm. *Id.* at 748. The district court concluded those claims were barred by the six-year statute of limitations in WIS. STAT. § 893.93(1)(b), and the Seventh Circuit affirmed that ruling on appeal. *KDC Foods*, 763 F.3d at 749, 754. In so doing, the Seventh Circuit rejected KDC Foods' argument that its claims were timely under the discovery rule. The court noted that, under Wisconsin law,

> "Discovery occurs when the plaintiff has information that would constitute the basis for an objective belief as to his or her injury and its cause." As soon as the defrauded party has "sufficient knowledge to make a reasonable person aware of the need for diligent investigation," the clock begins to run.

*KDC Foods*, 763 F.3d at 750 (citations omitted).

¶ 68. The Seventh Circuit further observed that the degree of certainty required to trigger a plaintiff's duty to investigate "is variable, depending on the particular facts and circumstances of the plaintiff," and that "with corporate players, a different quantum of expertise and knowledge is in play." *Id.* at 751. Consequently, "ignorance is a less compelling excuse for corporate enterprises in the context of the discovery rule." *Id.* Observing that both of the parties in *KDC Foods* were "experienced corporate players," the court concluded:

> Accordingly, we do not find that the circumstances justified a more forgiving application of the discovery rule to KDC. KDC did not require "a greater degree of certainty" than "initial suspicion" to trigger discovery of its alleged injury, and it certainly was not required to be convinced that actual fraud had occurred, as KDC argues in its briefs.

*Id.*

167

¶ 69. Similarly, in this case, Menard, Inc., is an experienced corporate player. As of September 1, 2005, Menard—its president and CEO—suspected Sands was acting in a way that violated her fiduciary duties. Menard raised concerns about Sands with Liupakka and Stienessen, both of whom advised against going forward with the Fund transaction. As in *KDC Foods*, these "initial suspicions" were sufficient to trigger Menard, Inc.'s duty to exercise reasonable diligence to investigate Sands' conduct. *See id.*

¶ 70. Menard, Inc., correctly notes that Sands, as its attorney and fiduciary, had an obligation to disclose any conflicts of interest pertaining to the Fund transaction. Menard, Inc., therefore argues it was not obligated to exercise reasonable diligence to investigate and discover any breach of Sands' fiduciary duties. Citing cases from Mississippi and Texas, Menard, Inc., asserts that, "because of the high level of trust that a client must necessarily place in his [or her] attorney, some courts have categorically refused to bar a client's claim against an attorney on statute-of-limitations grounds."

¶ 71. We do not find the foreign cases cited by Menard, Inc., persuasive. Instead, we conclude the existence of a fiduciary relationship, rather than excusing a client entirely from its obligation to investigate, is merely one factor to be considered in determining whether the client exercised reasonable diligence to discover a claim against its attorney. Under the circumstances of this case, although a fiduciary relationship existed between Sands and Menard, Inc., other undisputed facts show that Menard, Inc., was a sophisticated corporate actor and that its president and CEO harbored suspicions about Sands' conduct for approximately one year before the Fund transaction closed.

168

Those facts gave rise to a duty to investigate, regardless of the fiduciary relationship between Sands and Menard, Inc.

¶ 72. Finally, Menard, Inc., argues it cannot be expected to have discovered Sands' breach of fiduciary duty in September 2005 because it "was not able to confirm and complete its investigation . . . until after it obtained discovery in this case." Again, we reject Menard, Inc.'s argument, based on the Seventh Circuit's reasoning in *KDC Foods*. There, relying on an 1884 case, KDC Foods had argued it did not have any reason to suspect its former law firm had committed misconduct until it deposed attorneys from that firm in related litigation. *KDC Foods*, 763 F.3d at 752 (citing *O'Dell v. Burnham*, 61 Wis. 562, 21 N.W. 635 (1884)). According to KDC Foods, only after those depositions were conducted did it have "objective evidence" of the attorneys' "specific role in the fraud." *Id.* In rejecting this argument, the Seventh Circuit explained:

> *O'Dell* does not stand for the proposition that a plaintiff must have more knowledge than that which would prompt a reasonable person to inquire further into the alleged fraud. The Wisconsin courts—in over a hundred years of interpreting *O'Dell* and the discovery rule— have been clear that "actual and complete knowledge of the fraud on the part of the plaintiff is not necessary in order to set the limitation period running." It is well-understood that Wisconsin courts impute knowledge to a party when it "finds out enough to cause a reasonable [party] to make sufficient inquiries to discover a fraud."

*Id.* at 752–53 (internal citations omitted).

¶ 73. Here, although Menard, Inc., may not have had full knowledge of Sands' alleged misconduct on September 1, 2005, it certainly had enough information at that time to prompt a reasonable person—or, more to

the point, a reasonable corporation—to inquire further. As a result, Menard, Inc.'s counterclaim against Sands for breach of fiduciary duty accrued on September 1, 2005. Because the counterclaim accrued before November 3, 2006, it is barred by the two-year statute of limitations in Wis. Stat. § 893.57. *See supra,* ¶ 60. Consequently, the circuit court properly granted Sands summary judgment on the counterclaim.[18]

*By the Court.*—Orders affirmed.

---

[18] On appeal, Sands also argues Menard, Inc., lacked standing to bring the counterclaim because any injury caused by the alleged breach of Sands' fiduciary duties was sustained by Merchant Capital, rather than Menard, Inc. Because we conclude the circuit court properly dismissed Menard, Inc.'s counterclaim on statute of limitations grounds, we need not address Sands' argument regarding standing. *See Sweet v. Berge,* 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (appellate court need not address every issue raised by the parties when one issue is dispositive).