# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP2377 & 2015AP870 |
| COMPLETE TITLE: | Debra K. Sands,<br>  Plaintiff-Appellant-Petitioner,<br> v.<br>John R. Menard, Jr., Menard Thoroughbreds, Inc., Webster Hart as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts, Angela L. Bowe as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts and Alphons Pitterle as Trustee of the John R. Menard , Jr. 2002 Trust and Related Trusts,<br>  Defendants-Respondents,<br>Midwest Manufacturing Co., Wood Ecology Inc., Countertops Inc., Team Menard Inc., Menard Engine Group, Menard Competition Technologies LTD, MC Technologies Inc., Menard Engineering LTD, UltraMotive LTD and Merchant Capital LLC,<br>  Defendants,<br>Menard, Inc.,<br>  Defendant-Respondent-Cross Petitioner.<br>-------------------------------------------------<br>Debra K. Sands,<br>  Plaintiff-Appellant-Cross-Respondent-Petitioner,<br> v.<br>John R. Menard, Jr. and Menard Thoroughbreds, Inc.,<br>  Defendants-Respondents-Cross-Appellants,<br>Webster Hart as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts, Angela L. Bowe as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts, Alphons Pitterle as Trustee of the John R. Menard , Jr. 2002 Trust and Related Trusts, Midwest Manufacturing Co., Wood Ecology Inc., Countertops Inc., Team Menard Inc., Menard Engine Group, Menard Competition Technologies LTD, MC Technologies Inc., Menard Engineering LTD, UltraMotive LTD and Merchant Capital LLC,<br>  Defendants,<br>Menard, Inc.,<br><br>  Defendant-Respondent-Cross-Appellant-Cross Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 372 Wis. 2d 126, 887 N.W.2d 94

| | |
|---|---|
| OPINION FILED: | December 29, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 12, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Eau Claire |
| JUDGE: | Paul J. Lenz |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | |
| CONCURRED/DISSENTED: | ABRAHAMSON, J. concurs and dissents, joined by A.W. BRADLEY, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellant-cross-respondent-petitioner, there were briefs filed by *Charles K. Maier*, *Daniel R. Shulman*, *Richard C. Landon*, and *Gray*, *Plant*, *Mooty*, *Mooty & Bennett*, *P.A.*, Minneapolis, Minnesota, with whom on the briefs were *Mel C. Orchard*, *III*, and *The Spence Law Firm*, *LLC*, Jackson, Wyoming. There was an oral argument by *Daniel R. Shulman*.

For the defendant-respondent-cross-appellant-cross petitioner, there were briefs filed by *G. Richard White* and *Weld Riley*, *S.C.*, Eau Claire, with whom on the briefs were *Michael D. Freeborn*, *Brian P. Norton*, *Andrew C. Nordahl*, and *Freeborn & Peters*, *LLP*, Chicago, Illinois. There was an oral argument by *Brian P. Norton*.

For the defendants-respondents, there was a brief by *G. Richard White* and *Weld Riley*, *S.C.*, Eau Claire, with whom on the brief were *Todd Wind* and *Fredrikson & Byron*, *P.A.*, Minneapolis, Minnesota. There was an oral argument by *Todd Wind*.

2

For the defendants-respondents-cross-appellants, there was a brief filed by there was a brief filed by *G. Richard White* and *Weld Riley*, *S.C.*, Eau Claire, with whom on the briefs were *Michael D. Freeborn*, *Brian P. Norton*, *Andrew C. Nordahl*, and *Freeborn & Peters*, *LLP*, Chicago, Illinois.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Nos. 2012AP2377 & 2015AP870

(L.C. No. 2008CV990)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Debra K. Sands,**

      **Plaintiff-Appellant-Petitioner,**

  **v.**

**John R. Menard, Jr., Menard Thoroughbreds, Inc., Webster Hart as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts, Angela L. Bowe as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts and Alphons Pitterle as Trustee of the John R. Menard, Jr. 2002 Trust and Related Trusts,**

      **Defendants-Respondents,**

**Midwest Manufacturing Co., Wood Ecology Inc., Countertops Inc., Team Menard Inc., Menard Engine Group, Menard Competition Technologies LTD, MC Technologies Inc., Menard Engineering LTD, UltraMotive LTD and Merchant Capital LLC,**

      **Defendants,**

**Menard, Inc.,**

      **Defendant-Respondent-Cross Petitioner.**

**FILED**

**DEC 29, 2017**

Diane M. Fremgen
Clerk of Supreme Court

Debra K. Sands,

       Plaintiff-Appellant-Cross-Respondent-
       Petitioner,

    v.

John R. Menard, Jr. and Menard Thoroughbreds,
Inc.,

       Defendants-Respondents-Cross-
       Appellants,

Webster Hart as Trustee of the John R. Menard,
Jr. 2002 Trust and Related Trusts, Angela L.
Bowe as Trustee of the John R. Menard, Jr. 2002
Trust and Related Trusts, Alphons Pitterle as
Trustee of the John R. Menard, Jr. 2002 Trust
and Related Trusts, Midwest Manufacturing Co.,
Wood Ecology Inc., Countertops Inc., Team
Menard Inc., Menard Engine Group, Menard
Competition Technologies LTD, MC Technologies
Inc., Menard Engineering LTD, UltraMotive LTD
and Merchant Capital LLC,

       Defendants,

Menard, Inc.,

       Defendant-Respondent-Cross-Appellant-
       Cross Petitioner.

---

REVIEW of a decision of the court of appeals. *Affirmed.*


¶1    PATIENCE DRAKE ROGGENSACK, C.J.   We review a decision of the court of appeals, affirming the circuit court's[1] grant of summary judgment dismissing Debra Sands' claims and Menard,

---

[1] The Honorable Paul J. Lenz of Eau Claire County, presided.

Inc.'s counterclaim. Debra Sands and John Menard, Jr., were involved in a romantic relationship from late 1997 to April 2006.[2] Sands alleges that from 1998 until 2006 she cohabitated with Menard and they engaged in a "joint enterprise" to work together and grow Menard's businesses for their mutual benefit. Menard and his affiliated entities argue that by failing to comply with Supreme Court Rule 20:1.8(a), which regulates business transactions between lawyers and their clients, Sands is precluded from seeking an ownership interest in any of Menard's various business ventures.

¶2 We review four issues. First, we consider whether Sands has pleaded facts sufficient to establish what she styled as an unjust enrichment claim under Watts v. Watts, 137 Wis. 2d 506, 405 N.W.2d 305 (1987), thereby necessitating a remand to the circuit court for a full hearing on the merits. Second, we consider whether the court of appeals properly concluded that SCR 20:1.8(a) may be raised as a defense to an unjust enrichment claim. Third, we consider whether the court of appeals properly granted summary judgment to Sands on Menard, Inc.'s counterclaim for breach of fiduciary duty. And fourth,

---

[2] Debra Sands appeals from a judgment of the court of appeals, affirming the circuit court's grant of summary judgment dismissing Sands' claims against John Menard, Jr. ("Menard"), Menard, Inc., and Menard Thoroughbreds, Inc. ("collectively, the Menard Defendants") and against the trustees of the John R. Menard, Jr. 2002 Trust and related trusts ("the Trustees"). The Menard Defendants appeal from an order affirming summary judgment to Sands on Menard, Inc.'s counterclaim for breach of fiduciary duty.

we consider whether the court of appeals properly granted summary judgment to the Menard Trustees.

¶3 As to the claim she has characterized as a <u>Watts</u> unjust enrichment claim, we conclude that Sands has failed to allege facts which, if true, would support her legal conclusion that she and Menard had a joint enterprise that included accumulation of assets in which both she and Menard expected to share equally. On the second issue, for the reasons explained below, we conclude that SCR 20:1.8(a) may guide courts in determining required standards of care generally; however, it may not be used as an absolute defense to a civil claim involving an attorney.[3] And finally, we also conclude that the court of appeals properly granted summary judgment to Sands on Menard, Inc.'s counterclaim for breach of fiduciary duty, and to the Trustees on their motion for summary judgment dismissing Sands' claim.

¶4 Accordingly, we affirm the court of appeals.

## I. BACKGROUND

¶5 Menard is the founder, president, and CEO of Menard, Inc., a privately held chain of home improvement stores that began in Eau Claire, Wisconsin. In November 1997, nearly 40 years after starting his business, Menard began dating Sands, a lawyer licensed to practice in the state of Minnesota, who at

---

[3] We do not consider whether Menard or the Menard Defendants waived, ratified, or may be estopped to assert Sands' alleged non-compliance with SCR 20:1.8(a).

4

the time was directing several business ventures with her sister in St. Paul. Sands claims that she moved in with Menard in the summer of 1998, and they became engaged later that year. Menard admits that he and Sands were engaged, but denies that they ever lived together.

¶6 During their relationship, Sands alleges she made a number of business and personal contributions to both Menard and his companies, including Menard, Inc. and Menard Thoroughbreds, Inc. Although the parties agree that Sands made certain contributions, they do not agree as to the nature of those contributions, when they began, or who was the recipient at any given time. Sands describes her contributions to Menard and his companies as follows:

> She was Menard's life partner, social companion, and manager and hostess of his households. Sands protected Menard from unwanted approaches by serving as a "gate-keeper." She supervised his health care and medical needs; managed the remodeling of three residences; and advised on the acquisition of airplanes and their design and décor. She provided ideas for new products and product lines for the Menard, Inc., stores, such as garden centers; and scouted and proposed new store locations, store layouts, and product displays. She represented Menard, Inc., as a product buyer. She reviewed and suggested changes and additions to Menard, Inc., marketing plans. She assisted with government and public relations. She participated in the redesign of store signs and logos. She helped find new business and investment opportunities. She assisted in the management of the Team Menard auto racing venture and newly-acquired businesses, including two engine design companies in England, a thoroughbred racing business, and a $400 million private equity fund. She made her joint enterprise with Menard her focus, which occupied her every moment.

5

¶7   Sands claims that Menard repeatedly promised her that in return for these contributions, he would give her an ownership interest in his various business ventures. Menard denies ever making such promises, and states only that Sands provided certain legal services beginning in approximately 1997.

¶8   The parties also disagree as to whether Sands performed legal work for Menard or the Menard Defendants prior to the beginning of their romantic relationship. Sands contends that there was never any attorney-client relationship with the Menard Defendants prior to 1998. Conversely, the Menard Defendants assert that Sands began providing legal services in October 1997, before she and Menard began dating.

¶9   As evidence, the Menard Defendants submitted a May 28, 1998, invoice from Prima Group, a company owned by Sands and her sister, in the amount of $49,635.84. The invoice referenced a "client matter," listed as "Wisconsin Dept. of Natural Resources v. Menard, Inc." The invoice further indicated it was for "Governmental relations & Legal services rendered Oct. 15, 1997 – May 15, 1998." Sands claims that the invoice was prepared at Menard's request, in response to his offer to pay off Sands' remaining student loans of $49,635.84. Sands claims that Menard told her to send the invoice to Menard, Inc., so that the payment would be tax deductible as a business expense. Menard, however, claims this invoice related to legal services that

6

Sands provided in connection with a Wisconsin DNR investigation into Menard, Inc.'s disposal of wood ash.[4]

¶10 Although the parties disagree as to the nature of the legal services provided prior to 2003, both concede that beginning in 2003 Sands began to provide significant legal services to Menard, Inc.[5] Sands billed at an hourly rate of $145, and Menard, Inc. paid Sands a total of $152,105 for seven invoices.

¶11 In early 2004, Sands assisted in the creation of a private equity fund ("the Fund"). Steve Hilbert, a businessman with money management experience and a long-time friend of Menard's, began to meet with Menard to discuss the Fund. According to Sands, Menard asked her to review documentation used to create the Fund. Menard, Inc., however, asserts that from at least January 2005 through October 2005, Menard, Inc. had retained Sands as its outside legal counsel to represent it in the Fund transaction.

---

[4] A similarly questionable transaction involving race car driver Robby Gordon began in September 1998. The record reflects that Menard, Inc. paid Sands $3,000 on September 21, 1999, for her work on the Gordon transaction. Sands concedes that she performed some work as Menard's business advisor——not lawyer——but states that the payment was actually a reimbursement for wedding planning expenses. Sands v. Menard, 2016 WI App 76, ¶¶9-10, 372 Wis. 2d 126, 887 N.W.2d 94.

[5] The parties disagree as to whether Sands ever provided legal services to Menard personally. According to Sands, Menard himself was never a client.

7

¶12 Menard alleges that Sands was responsible for negotiating the terms of the transaction with Hilbert, in addition to reviewing and editing the Fund transaction documents. Sands states that she was never asked and never did create invoices for her work for Menard, in part because she believed her efforts were part of her and Menard's "joint enterprise." It was not until her relationship with Menard ended in 2006 that Menard instructed her to provide itemized invoices for all legal services for which she had not been paid, dating back to 2003. Sands then submitted 190 separate invoices for work performed between February 2003 and April 2006, representing 7,487.10 hours of legal work at $145 per hour, for a total fee of $1,085,629.50.

¶13 Sands met with Menard and Pete Liupakka, Menard, Inc.'s CFO, to discuss the invoices in October 2006. Liupakka believed that the number of hours reflected on the invoices was excessive. Nevertheless, Menard, Inc. offered to pay Sands $961,518——the amount claimed in the invoices minus payments that Menard, Inc. believed Sands had already received. However, Menard, Inc. made receipt of this payment conditioned on Sands signing a one-page "release of all claims" that included a waiver of any "quasi-marital claims." Sands refused to sign, prompting Menard, Inc. to offer an additional $100,000. Sands again refused, and Menard, Inc. rescinded its offer to pay any portion of the fees reflected in the invoices.

8

¶14 On November 3, 2008, Sands filed suit against Menard, the Menard Defendants, and eleven other parties owned or controlled by Menard. She asserted claims for Unjust Enrichment, Implied Contract, Promissory Estoppel, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Fraudulent Misrepresentation, Conversion, and Breach of Fiduciary Relationship. On November 19, 2009, Sands filed an amended complaint, re-alleging her claims of unjust enrichment against Menard, asserting breach of contract and promissory estoppel claims against Menard, and claims for unjust enrichment against Menard, Inc., Menard Thoroughbreds, Inc., and MH Private Equity Fund LLC ("MH Equity"). A second amended complaint was filed on May 10, 2011, adding the Trustees as defendants.

¶15 Shortly after Sands filed her second amended complaint, the Menard Defendants discovered evidence that Sands had a side agreement with Hilbert, prompting accusations that Sands had been attempting to obtain an ownership interest or employment with MH Equity while she was representing them in the Fund transaction. Therefore, on May 25, 2011, the Menard Defendants asserted a counterclaim for breach of fiduciary duty under SCR 20:1.8(a).

¶16 On April 12, 2012, the Menard Defendants moved for summary judgment to dismiss all of Sands' claims by which she sought a portion of Menard's "net worth or assets, ownership interests in the Menard companies, or any part of the increase

9

in value of the Menard Companies." The Menard Defendants argued that SCR 20:1.8(a) barred Sands from recovering any portion of Menard's assets or an ownership interest in his companies because she had failed to comply with SCR 20:1.8(a), which regulates business transactions between attorneys and their clients.

¶17 The Trustees also moved for summary judgment, arguing that Sands' theory of unjust enrichment failed as a matter of law because: (1) even if Sands benefitted Menard or Menard, Inc., her claim would therefore be against the Menard Defendants, not the Trustees; (2) she did not allege facts, which if true, would show any benefit conferred to the Trustees; and (3) she failed to allege facts showing "unjust circumstances."

¶18 Following an oral ruling on October 12, 2012, the circuit court entered summary judgment on October 22, 2012. The court acknowledged that Sands had violated SCR 20:1.8(a),[6] but declined to adopt a bright-line rule that SCR 20:1.8(a) prohibits an attorney from bringing what Sands has styled as a <u>Watts</u> unjust enrichment claim regarding past contributions. Rather, the court recognized an implicit exception to SCR 20:1.8(a), such that it does not bar an attorney from bringing

---

[6] The court found that: (1) Sands is a lawyer and was a lawyer at all relevant times; (2) Sands performed legal services for Menard and the Menard Defendants; and (3) Sands did not obtain a written agreement to acquire any portion of the Menard Defendants' assets.

10

an equitable claim for contributions provided in a romantic relationship if: (1) the romantic relationship predates the attorney-client relationship; and (2) "the legal services rendered are merely ancillary or incidental to the larger joint enterprise of the parties."[7]

¶19 As to the first requirement, the court focused on whether Sands' May 28, 1998, invoice for "Governmental relations & Legal services" established that her attorney-client relationship began before her romantic relationship with Menard.[8] Even accepting as true Sands' claim that the invoice was a fraudulent document submitted at Menard's request, the court stated that it would deny relief in equity due to Sands' admitted fraud regarding the invoice, which showed that she was in pari delicto[9] with Menard and, thus, the court would "leave matters where they stand."[10]

---

[7] During this hearing Judge Lenz focused on the legal services as opposed to Sands' general contributions because the proposed defense, namely, that SCR 20:1.8(a) barred Sands' claim, applies to attorney-client relationships and their attendant legal services.

[8] See Security Pac. Nat'l Bank v. Ginkowski, 140 Wis. 2d 332, 339, 410 N.W.2d 589, 593 (Ct. App. 1987) (Stating that for the concept of the clean hands doctrine to be applied, "it must be shown that the alleged conduct constituting 'unclean hands' caused the harm from which the plaintiff now seeks relief.").

[9] Latin for "in equal fault." Black's Law Dictionary 911 (10th ed. 2014).

[10] The circuit court did not address the waiver, ratification, or estoppel arguments.

¶20 Looking to the second element of the exception, the court found that no reasonable jury could find that Sands' legal services were "merely ancillary or incidental." Therefore, because neither exception to its test applied, the court concluded that Sands' violation of SCR 20:1.8(a) barred her claims against the Menard Defendants. The court then held that because Sands could not recover against Menard, she could not recover against the Trustees. The circuit court then granted summary judgment to the Trustees. Sands' claim against the Menard Defendants for compensation for services rendered remained.

¶21 Sands appealed from the order regarding the Trustees and petitioned for leave to appeal from the order regarding the Menard Defendants. The court of appeals denied Sands' motion, but stayed her appeal of the order regarding the Trustees pending the disposition of her remaining claims in circuit court. Sands v. Menard, 2016 WI App 76, ¶21, 372 Wis. 2d 126, 887 N.W.2d 94.

¶22 After the circuit court granted partial summary judgment, Sands claimed that she was entitled to compensation for her non-legal services. In support, she submitted extensive documentation of the various "non-legal" services she had provided, and for which she alleged she was entitled to receive compensation. The Menard Defendants moved to strike, pointing to Sands' previous affidavit in which she stated that she never

12

expected to be compensated for personal and family services. The court granted the motion.

¶23 Refusing to concede that her only remaining claim was for compensation for legal services "at a rate of $145 per hour," Sands next asserted that she was entitled to the quantum meruit value of her legal services, which she claimed was between $355 and $640 per hour. Again, the Menard Defendants moved to strike, arguing that Sands could not recover on a quasi-contract theory when she had an express contract with Menard to be paid $145 per hour for her legal services. The court agreed, explaining that "even if [$145 per hour] was dictated by the client, Mr. Menard, this was clearly the agreed rate." The circuit court distinguished unjust enrichment claims from quantum meruit, stating that while a plaintiff asserting a Watts unjust enrichment claim seeks to recover a fair portion of the increase in the couple's net worth, a quantum meruit claim seeks to recover the fair value of services performed based on a contract implied by law. The dismissal of Sands' quantum meruit claim therefore did not affect her unjust enrichment claim. The circuit court also stated that Sands' quantum meruit claims were barred because of her failure to comply with SCR 20:1.8(a).

¶24 Sands moved for summary judgment on Menard, Inc.'s counterclaim for breach of fiduciary duty. The circuit court granted the motion, concluding that the counterclaim was barred by the applicable statute of limitations and that a reasonable

person in Menard's situation would have further investigated his suspicions of Sands' disloyalty at an earlier date.

¶25 On April 24, 2015, Sands filed a notice of appeal from the circuit court's final order, and Menard, Inc. cross-appealed from the order dismissing its counterclaim for breach of fiduciary duty.

¶26 Proceedings at the court of appeals involved the consolidation of the direct appeal from the 2012 judgment disposing of all claims between Sands and the Trustees, and a direct appeal from the 2015 final judgment disposing of all claims between Sands, Menard, and the Menard Defendants. The court of appeals affirmed the circuit court, but on different grounds.

¶27 Sands filed a petition for review on October 19, 2016, which was followed by a petition for cross-review filed by the Menard Defendants on November 18, 2016. We granted review, and now affirm.

## II.  DISCUSSION

### A.  Standard of Review

¶28 We review a grant or denial of summary judgment independently, applying the same standards as employed by the circuit court, while benefitting from the discussions of the court of appeals and the circuit court. Dufour v. Progressive Classic Ins. Co., 2016 WI 59, ¶12, 370 Wis. 2d 313, 881 N.W.2d 678; Preisler v. General Cas. Ins. Co., 2014 WI 135, ¶16, 360 Wis. 2d 129, 857 N.W.2d 136. Summary judgment is

appropriate in cases where there is no genuine issue of material fact and the moving party has established his or her right to judgment as a matter of law. Wis. Stat. § 802.08(2);[11] Wadzinski v. Auto-Owners Ins. Co., 2012 WI 75, ¶10, 342 Wis. 2d 311, 818 N.W.2d 819. We review summary judgment submissions in the light most favorable to the nonmoving party. Id.

### B. Unjust Enrichment Claim

### 1. General principles

¶29 Sands asserts she has a claim against Menard for unjust enrichment. She relies on her interpretation of Watts, where we concluded that public policy does not preclude unmarried, former cohabitants from raising "claims based upon unjust enrichment following the termination of their relationships where one of the parties attempts to retain an unreasonable amount of the property acquired through the efforts of both." Watts, 137 Wis. 2d 506 at 532-33.[12]

---

[11] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

[12] Plaintiff, Sue Ann Watts, asserted five legal theories to support her claim: (1) Sue Ann and James, and their children, constituted a "family," thus entitling Sue Ann to bring an action for property division under Wis. Stat. § 767.02(1)(h) (1985-86), and to have the court divide their property pursuant to Wis. Stat. § 767.255 (1985-86); (2) James's words and conduct estopped him from asserting the lack of a legal marriage as a defense under Wis. Stat. § 767.255; (3) Sue Ann and James had a contract, either express or implied in fact, to share equally the property accumulated during their relationship; (4) unjust enrichment; and (5) partition. The Watts court dismissed claims one and two, holding that divorce statutes were exclusively for those persons who were legally married, but concluded that all other legal remedies were available. Watts v. Watts, 137
(continued)

15

¶30 The Watts court relied on the usual legal standard for unjust enrichment:

> [A] claim for unjust enrichment does not arise out of an agreement entered into by the parties. Rather, an action for recovery based upon unjust enrichment is grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust.

Id. at 530. Unjust enrichment requires proof of three elements: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable to do so. Id. at 531. In order to plead an unjust enrichment claim, the party seeking judicial relief must allege facts that, if true, would be sufficient to satisfy a court that the above elements are present. In Watts, we concluded that they were. Id. at 533.

¶31 Watts held that neither public policy nor the abolition of common-law marriage prohibited an unmarried cohabitant from asserting a contractual or quasi-contractual claim against another cohabitant.[13] Sue Ann Watts sued James Watts over their respective interests in property accumulated

---

Wis. 2d 506, 511-12, 405 N.W.2d 305 (1987). We focus our analysis on the decision's holding as to unjust enrichment.

[13] Common law marriage was abolished in Wisconsin by statute in 1917. Meyer v. Meyer, 2000 WI 132, ¶63 n.1, 239 Wis. 2d 731, 620 N.W.2d 382 (Sykes, J., dissenting) (citing § 21, ch. 218, Laws of 1917). Watts did not preclude the remedy of unjust enrichment for parties—unmarried cohabitants—who may otherwise have been precluded from seeking judicial relief.

16

during their 12-year cohabitation. Id. at 510. Sue Ann assumed James' last name as her own, and together the couple raised two children, who also shared the Watts name. They filed joint income tax returns and maintained joint bank accounts. Sue Ann and James purchased real and personal property together; Sue Ann co-signed for the loans James obtained. Watts, 137 Wis. 2d at 513-14.

¶32 During this period Sue Ann managed the home front so that James could build Watts Landscaping. She was a homemaker who cared for their children. She cleaned, cooked, laundered, shopped, ran errands, and maintained the grounds surrounding the parties' home. Id. at 513. She contributed personal property that she owned at the beginning of the relationship, served as hostess for James at both social and business-related events, and for a time worked 20-25 hours per week at James' office, performing duties as a receptionist, typist and assistant bookkeeper. Id. at 513-14.

¶33 Sue Ann alleged that because of her personal and business contributions, the business and personal wealth of the couple increased. Id. at 514. Following the termination of their relationship, however, James refused to compensate Sue Ann for these contributions despite his indications that she would share equally in the increased wealth. Id.

¶34 In holding that Sue Ann had stated a claim for relief, we focused our analysis on principles of equity and fairness. Id. at 532-33. Specifically, we concluded that regardless of

17

the nature of the relationship, the court should enforce contract, quasi-contract, and property rights where "one party keeps all or most of the assets accumulated during the relationship, while the other party, no more or less 'guilty,' is deprived of property which he or she has helped to accumulate." Id. at 526.

¶35 In concluding that Sue Ann had stated a claim, we determined it would be unjust and inequitable to allow James to retain the entire benefit of their joint enterprise. As to the three elements of unjust enrichment, we concluded: (1) Sue Ann contributed property and services to the relationship; (2) the couple's assets increased as a result of these contributions; and (3) James' retaining all of the assets was inequitable. Watts, 137 Wis. 2d at 533.

¶36 Subsequent to our decision in Watts, unjust enrichment claims in the context of unmarried cohabitants have appeared before Wisconsin courts on an infrequent basis.[14] Nevertheless, case law does provide some guidance on the scope of unjust enrichment claims and, in particular, the types of facts that must be pled in order to survive summary judgment.

¶37 In Waage v. Borer, 188 Wis. 2d 324, 525 N.W.2d 96 (Ct. App. 1994), the court of appeals held that proof of the elements of unjust enrichment must be demonstrated by showing: (1) an

---

[14] Indeed, of the 171 cases citing to Watts, only a handful discuss Sue Ann's unjust enrichment claim, and fewer are published or authored decisions.

18

accumulation of assets; (2) acquired through the efforts of the claimant and the other party; and (3) retained by the other party in an unreasonable amount. Id. at 329-30. At trial, Borer claimed money for her housekeeping efforts after Waage reneged on an alleged promise to marry her. The court concluded that despite her cooking, cleaning, and childcare services, Borer failed to allege facts sufficient to meet the Watts unjust enrichment standard. Specifically, the court held that only certain benefits will constitute "assets" or "property" for the purposes of unjust enrichment. "Watts does not recognize recompense for housekeeping or other services unless the services are linked to an accumulation of wealth or assets during the relationship." Id. at 330. In alleging only that Waage retained a benefit from Borer's uncompensated housekeeping efforts made in contemplation of marriage, the court concluded that Borer had not met the unjust enrichment standard. Furthermore, the court explained that there is no cause of action for breaching an alleged promise to marry.

¶38 In Ward v. Jahnke, 220 Wis. 2d 539, 583 N.W.2d 656 (Ct. App. 1998), the court of appeals reemphasized that in order for a plaintiff to successfully demonstrate unjust enrichment he or she must present proof that the assets or property acquired during cohabitation were acquired as a result of a mutual undertaking or joint effort. Id. at 552. Sandra Ward and Dennis Jahnke had shared an apartment for nearly four years, during which time Ward paid rent and all other household

19

expenses so that Jahnke could save money for a down payment on a house. Jahnke eventually purchased a home, making the $11,000 down payment and all mortgage and tax payments on the property. For the next nine years, Ward lived in the home rent-free, although she did pay utilities and purchased groceries. All finances were kept separate. Upon their separation, Ward claimed that Jahnke was unjustly enriched because he was able to accumulate a down payment while she paid for nearly all of their household expenses. Id. at 544. She also argued that because she moved into Jahnke's house and continued to pay certain expenses, the house itself was an asset accumulated through their joint efforts and retained by Jahnke in an unreasonable amount. Id.

¶39 Applying the elements of unjust enrichment to the facts, the court of appeals affirmed the circuit court's conclusion that Jahnke was unjustly enriched by Ward's efforts during the period of cohabitation in which she paid rent and all other household expenses. Id. at 550. "We agree that under these facts, Ward's assumption of the cost of the couple's living expenses was a benefit conferred on Jahnke which resulted in an accumulation of the asset — the [$11,000] down payment." Id. However, the court reversed the circuit court's conclusion that Jahnke had been unjustly enriched following the purchase of the home.[15] "Not only does Ward's claim lack a single Watts

_____

[15] At the circuit court, Ward had received a jury award of $45,000, or one-half of the equity in the house. Ward v. Jahnke, 220 Wis. 2d 539, 544, 583 N.W.2d 656 (Ct. App. 1998).

20

factor, her testimony as to their financial arrangements shows only that she and Jahnke were cohabitants who divided their household expenses in such a way that it made it easy to maintain separate finances and avoid commingling their individual resources." Id. at 550-51.

¶40 In so holding, the appeals court stated that it does not read the list of factors outlined in Watts as a checklist, but rather as "requiring a plaintiff to put forth facts which indicate a shared enterprise and some form of proof that the assets or property in dispute were 'acquired through the efforts of both.'" Id. at 547-48 (quoting Watts, 137 Wis. 2d at 533) (emphasis in original).[16] It is only after a party can demonstrate the existence of a joint enterprise that the court may award equitable relief. See Ulrich v. Zemke, 2002 WI App 246, ¶12, 258 Wis. 2d 180, 654 N.W.2d 458.

> The proper legal standard requires the court to . . . analyze the character of the parties' relationship by inquiring whether the relationship was a joint enterprise which encompassed the accumulation of assets. A court makes this determination by considering the total circumstances of the parties' relationship, specifically whether the parties' contributed property and services to the relationship producing an increase in wealth.

[16] See, e.g., Watts, 137 Wis. 2d at 533 n.21 (listing four out-of-state decisions in which a cohabitant's unjust enrichment claim was founded on specific facts that showed a mutual undertaking or joint effort); Ward, 220 Wis. 2d at 548 n.3 (describing in further detail the footnote found in Watts).

Id., ¶12.[17]

¶41 Properly understood, Watts stands for a very simple proposition: Wisconsin's public policy favoring marriage does not prohibit unmarried formerly cohabitating couples from asserting unjust enrichment claims against one another. Watts, 137 Wis. 2d at 532. In such cases, the focus is on the benefit received by one party from the other party which would be inequitable to retain. Boldt v. State, 101 Wis. 2d 566, 573, 305 N.W.2d 133 (1981). Therefore, the proper focus is on property accumulated, not on the type of personal relationship that existed between the parties. Stated otherwise, a claim for unjust enrichment may lie when two people work together to acquire property "through the efforts of both," regardless of their personal relationship. Watts, 137 Wis. 2d at 533.

¶42 That James and Sue Ann Watts were romantic cohabitants is not central to the merits of Sue Ann's unjust enrichment claim. For example, if James, instead, had a joint enterprise to accumulate wealth with his sister, mom or next door neighbor who provided necessary child care, domestic services and part-time office help, an unjust enrichment claim by that person would require the same proof as Watts required of Sue Ann. Watts simply provided that cohabitation between unmarried

---

[17] In Ulrich v. Zemke, 2002 WI App 246, 258 Wis. 2d 180, 654 N.W.2d 458, the court concluded that where a couple maintained a house together, raised four children, shared living expenses, and continually acquired real and personal property, they had acted as a joint enterprise.

romantic partners is not a bar to an otherwise valid claim of unjust enrichment. It did not provide that the romantic relationship created the claim for relief. Watts, 137 Wis. 2d at 532-33.

### 2. Sands' pleadings

¶43 To plead facts sufficient to support an unjust enrichment claim, Sands must demonstrate: (1) a benefit conferred on Menard by Sands; (2) appreciation or knowledge by Menard of the benefit;[18] and (3) acceptance or retention of assets arising from the benefit by Menard under circumstances making it inequitable for him to retain all of those assets. Stated otherwise, Sands' unjust enrichment claim must demonstrate that, viewed in their entirety, the contributions she made to a joint enterprise in which she and Menard were mutually engaged resulted in an accumulation of wealth that Menard unfairly retained. Ward, 220 Wis. 2d at 552 (explaining the importance of a mutual undertaking or joint effort).

¶44 Based on her allegations in the pleadings, which we accept as true for purposes of summary judgment, Sands made a variety of contributions to Menard, both professionally and personally. Professionally, she offered business and legal advice, political consultation services, marketing and research expertise. She was directly involved in decisions regarding

---

[18] For purposes of our discussion it is undisputed that Menard was aware of Sands' contributions. We therefore focus our analysis on the first and third prongs.

23

Menards' Indycar and NASCAR racing sponsorships, and she advised Menard on numerous corporate matters. In their personal relationship,[19] Sands supervised Menard's health care and medical needs, planned and prepared meals, and assisted with gardening and other household tasks. Sands advised about refurbishment and redecoration of three personal residences, acted as hostess of Menards' households, and provided both personal and family advice. Sands contends that as a result of these and other contributions she is entitled to judgment in an amount equal to the fair and reasonable share of the property, wealth, and increased net worth acquired by Menard during their cohabitation. We disagree.

¶45 First, Watts and the cases that followed make clear that unjust enrichment by a former cohabitant is founded on the premise of a mutual undertaking or joint enterprise which results in an accumulation of assets in which the parties expected to share equally but which are unfairly retained by one party. In Watts, we emphasized that as a direct result of Sue Ann's efforts, James' business grew and the parties' assets increased.

---

[19] We again clarify that unjust enrichment claims do not require an intimate relationship; the emphasis is on the property acquired. However, to the extent that Sands claims these personal contributions allowed Menard to focus his attention on his companies, they are relevant to her unjust enrichment claim, namely, whether any assets were acquired "through the efforts of both." See Ward, 220 Wis. 2d at 549.

24

¶46 In Ward, the court distinguished between the couple's initial, forty-four month cohabitation, during which time they lived in Ward's apartment where the $11,000 down payment was accumulated, and the latter period during which they lived in the house purchased by Jahnke. The court affirmed the circuit court's finding that Ward's assumption of most household expenses during the initial forty-four months was "predicated on a mutual undertaking to accumulate a down payment on a house." Ward, 220 Wis. 2d at 550. "The length of time this arrangement persisted, with undisputed testimony that Ward assumed nearly all of the couple's living expenses, coupled with the fact that Jahnke then made a substantial down payment on a house lends credibility to Ward's claim that this was a shared undertaking." Id.

¶47 However, the court concluded that Ward had failed to satisfy the unjust enrichment standard for the period following the purchase of the home. First, Jahnke had paid all closing costs associated with the house, and all mortgage and tax payments thereafter. Second, although Ward did the cooking, cleaning, and laundry, as well as paid for groceries and utilities while living in the house, these contributions were offset by the fact that she did not pay rent, and that Jahnke took care of all maintenance work. Finally, the evidence did not support the assertion of a joint enterprise after the house had been purchased. Each maintained separate bank accounts and had individual insurance policies. Each purchased, paid for,

25

and maintained his or her own vehicle. They never held joint savings or checking accounts, purchased items together, took on any joint debt, or loaned each other money. Ward, 220 Wis. 2d at 543. Given these facts, the court concluded, "Ward cannot claim that her assumption of the costs of the utilities and groceries in a shared living arrangement, while living rent free, entitles her to share in the equity of a house titled in another's name. Evidence of a mutual undertaking is completely lacking." Id. at 552. Comparing the facts and outcomes in Watts and Ward with the facts alleged by Sands, we conclude that Sands' and Menard's relationship more closely resembles that of Ward and Jahnke after the purchase of Jahnke's home.

¶48 First, at the time Sands and Menard met, Menard, Inc. had been a business for almost forty years, and Menard was already a multi-millionaire. Sands, meanwhile, was a graduate of law school operating at least three separate businesses with her sister in St. Paul, Minnesota. Therefore, while Menard's net worth was undoubtedly higher than Sands', both parties had sufficient financial means and business acumen. We therefore reject any comparison of Sands' contributions to those of Sue Ann Watts, who helped James Watts begin and grow his landscaping business, or to those of Sandra Ward, whose contributions allowed Dennis Jahnke to save $11,000 for the down payment on a house. In each of those cases, the parties had very little, and it was only through their joint efforts that their assets or

property increased. Sands, however, did not support Menard as he built his empire; he already had it when they met.

¶49 Second, we note the inherent differences between how Sue Ann and James Watts conducted themselves, and how Sands and Menard conducted themselves during their respective relationships. Sands has not alleged that during their relationship she and Menard commingled finances, filed joint tax returns, or made joint purchases of real and/or personal property. Sands did not obligate herself to any business or personal debt Menard incurred. Given these undisputed facts, we conclude that Sands and Menard were not engaged in a "joint enterprise" as required under Watts.[20]

¶50 Although we conclude that there was no "joint enterprise," we nonetheless turn to Watts' three-part unjust enrichment analysis to evaluate the underlying merits of Sands' unjust enrichment claim. Under the first prong, Sands must allege sufficient facts which, if true, would prove that her contributions were material to increasing Menard's wealth. Here, despite the litany of contributions she made, see, e.g.

---

[20] Once again, the precise nature of the underlying relationship is not the linchpin of our analysis. However, we do consider the circumstances of the relationship relevant in helping us determine whether the elements of unjust enrichment have been met, particularly the second element under the Waage test, Waage v. Borer, 188 Wis. 2d 324, 329-30, 525 N.W.2d 96 (Ct. App. 1994) (requiring "(1) an accumulation of assets; (2) acquired through the efforts of the claimant and the other party and (3) retained by the other party in an unreasonable amount.").

27

supra ¶6, we cannot conclude that Sands' contributions were "material" given Menard's wealth and the success of his company when the parties met. In particular, although Sands has listed a series of business transactions in which she "participated" or "assisted," she has alleged no facts from which we could conclude that her contributions caused an increase in Menard's assets or property.

¶51 We are similarly disinclined to conclude that Sands has pled sufficient facts which, if true, would demonstrate that Menard's acceptance or retention of her contributions would be inequitable under the circumstances. In particular, Sands must demonstrate that the benefits she conferred to Menard are not offset by the benefits she derived from him. First, the record indicates that Sands enjoyed an expansive lifestyle as the companion of a wealthy man.[21] Second, unlike the plaintiffs in Watts or Ward, Sands did receive compensation for some of her services. Over the course of their eight-year relationship, Sands was paid $49,635.84 for the balance of her student loans,[22] $3,000 to compensate her for "wedding expenses," and $152,105 for various legal services.

---

[21] For example, the record reflects that Sands and Menard took multiple boating and skiing trips, vacations to St. Martin, London, and Italy, and that Menard gifted Sands with a Ford Mustang for Christmas in 2005. They went to horse races, NASCAR events, and fashion shows, and met prominent political figures at that time.

[22] As referenced above, it is disputed whether this payment was for her student loans or for legal services in regard to the DNR matter.

28

¶52 Sands argues, however, that because Menard "repeatedly" promised her that she would obtain a certain ownership interest in Menard, Inc., and because she made contributions "fully and faithfully and in reliance on the promises and representations of Menard," it would be inequitable to deny her an ownership interest in his property. Given that a specific agreement is unnecessary under Watts, Sands' allegations that she was promised a certain ownership interest are not persuasive. In short, we conclude that Sands has failed to allege facts which, if true, would support her legal conclusion that she and Menard had a shared enterprise that included accumulation of assets in which both she and Menard expected to share equally.[23]

## C. Rules of Professional Conduct

¶53 In light of our conclusion that Sands has failed to allege facts which, if true, would support what she has styled as a Watts unjust enrichment claim, analyzing whether her claim also is barred by SCR 20:1.8(a) may not seem necessary. Nonetheless, because the question of whether a Supreme Court Rule can be used as an absolute defense against an attorney in a civil action is an important issue, we address it here. For the reasons stated below, we conclude: (1) the court of appeals

---

[23] We do not suggest that a former cohabitant may never plead facts sufficient to establish a "material benefit" unjustly obtained by a wealthy partner. We simply hold that in this case, Sands did not plead facts sufficient to meet the criteria for unjust enrichment set forth in Watts.

29

erred in holding SCR 20:1.8(a) created an absolute bar to Sands' unjust enrichment claim; and (2) although SCR ch. 20 may not be used as an absolute defense to a civil claim where an attorney is a party, SCR 20:1.8(a) may guide courts in determining whether those standards of care that generally are required of lawyers have been met.

### 1. General principles

¶54 Supreme Court Rule ch. 20 sets forth the regulations governing professional conduct of attorneys licensed to practice law in the State of Wisconsin. Attorneys not admitted to the State Bar of Wisconsin may be subject to the disciplinary action in Wisconsin "if the lawyer provides or offers any legal services in the state." SCR 20:8.5(a). We have the exclusive authority to define the "practice of law." See Seitzinger v. Cmty. Health Network, 2004 WI 28, ¶39, 270 Wis. 2d 1, 676 N.W.2d 426. We have previously concluded that deciding whether one engaged in the "practice of law" is determined on a case-by-case basis. State ex rel. Junior Ass'n of Milwaukee Bar v. Rice, 236 Wis. 38, 53, 294 N.W. 550, 556 (1940).

¶55 At all times relevant to the current litigation, attorneys licensed outside of Wisconsin who were acting as in-house counsel in this state were not "practicing law" for the purposes of bar admission. See Mostkoff v. Bd. of Bar Exam'rs, 2005 WI 33, ¶19, 279 Wis. 2d 249, 693 N.W.2d 748 (concluding Michigan attorney's legal services as corporate counsel were not the "practice of law" for purposes of admission to the State Bar

30

of Wisconsin).  Therefore, because at that time an attorney who was not licensed to practice in Wisconsin, but who was nonetheless serving as in-house counsel for a Wisconsin corporation, was not eligible for bar admission based solely on in-house counsel services, he also was not subject to regulation by the State Bar of Wisconsin.

¶56 As to all attorneys practicing law in this state, we have previously ruled that "[v]iolations of the Code of Professional Conduct are determined only by means of disciplinary action."  Foley-Ciccantelli v. Bishop's Grove Condo., 2011 WI 36, ¶2, 333 Wis. 2d 402, 797 N.W.2d 789. Indeed, as stated in preamble [20][24] to the Rules in effect during Sands' alleged cohabitation:

> Violation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached.  In addition, violation of a rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation.  The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability.  Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons.  The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a

---

[24] The preamble was amended in 2007 to add the following concluding sentence:  "Nevertheless, since the rules do establish standards of conduct by lawyers, a lawyer's violation of a rule may be evidence of breach of the applicable standard of conduct."

disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule.

¶57 The court of appeals has also endorsed the use of the Rules of Professional Conduct as guidelines or principles in civil litigation. Gustafson v. Physicians Ins. Co., 223 Wis. 2d 164, 176-78, 588 N.W.2d 363 (Ct. App. 1998). In Gustafson, the plaintiffs' attorney in a medical malpractice case also agreed to represent the interests of the plaintiffs' subrogated health insurer in exchange for one-third of the health insurer's recovery. Id. at 168. After a jury rendered a verdict in favor of the defendants, the plaintiffs' attorney reached a settlement agreement with the defendants whereby the plaintiffs waived their right to appeal the judgment in exchange for the defendants' agreement not to seek taxable costs against them. Id. at 169. However, the plaintiffs' attorney never consulted with the subrogated insurer about the settlement and it expressly left the defendants the option of taxing costs against the subrogated insurer, which they did. Id. The subrogated insurer appealed on the basis that the judgment was unfair because of the attorney's misconduct, whereupon the settlement was voided. Id.

¶58 In determining whether the judgment for taxable costs should be reversed due to the attorney's conduct, the court of appeals considered several of the Rules of Professional Conduct as guidelines or principles. For example, SCR 20:1.16 was considered to determine whether the plaintiffs' attorney

32

properly withdrew from representing the subrogated insurer; SCR 20:1.2 was considered to determine whether the attorney should have informed the subrogated insurer of the proposed settlement; and SCR 20:1.7 was reviewed to determine whether the attorney had an impermissible conflict of interest when he negotiated the settlement. Id. at 176-78. Taxable costs were reversed because the attorney failed to adequately protect his client. Id. at 182.

### 2. SCR 20:1.8(a) general principles

¶59 Supreme Court Rule 20:1.8(a) applies to financial conflicts of interest that may arise when an attorney "enter[s] into a business transaction with a client or knowingly acquire[s] an ownership, possessory, security or other pecuniary interest adverse to a client." SCR 20:1.8(a). During the relevant time period, SCR 20:1.8(a) provided:

> A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to the client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>
> (3) the client consents in writing thereto.

33

¶60 Supreme Court Rule 20:1.8(a) is grounded in the concern that "[a] lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a business, property or financial transaction with a client." See Model Rules of Prof'l Conduct r. 1.8 cmt. (Am. Bar Ass'n 2015). The rule applies to all attorney-client relationships, and includes transactions in which an attorney seeks an ownership interest in the client's business as compensation for his or her legal services. See id. The existence of an attorney-client relationship "depends upon the intent of the parties and is a question of fact." In re Disciplinary Proceedings Against Kostich, 2010 WI 136, ¶16, 330 Wis. 2d 378, 793 N.W.2d 494.

### 3. SCR 20:1.8(a) and Sands

¶61 Both the circuit court and the court of appeals applied SCR 20:1.8(a) to Sands' Watts unjust enrichment claim. The circuit court formulated a two-part exception to Menard's proposed bright-line rule, namely, that SCR 20:1.8(a) is an absolute defense unless two conditions are met: (1) the attorney and client had a romantic relationship that predated their attorney-client relationship; and (2) the legal services rendered by the attorney were "merely ancillary or incidental" to the larger joint enterprise. The court of appeals went one step further, holding that a violation of SCR 20:1.8(a) is an absolute bar to recovery. Sands, 372 Wis. 2d 126, ¶38. As to

34

both dispositions, we disagree, and conclude that while Supreme Court Rules may guide courts in determining required standards of care generally, they may not be employed as an absolute defense in a civil action involving an attorney.

¶62 As Sands has repeatedly pointed out, the preamble to the Supreme Court Rules clearly demonstrates that alleged violations are to be determined in disciplinary proceedings, not civil litigation. "The Preamble demonstrates that the purpose of the rules is not to provide remedies outside the realm of professional discipline." Foley-Ciccantelli, 333 Wis. 2d 402, ¶173 (Roggensack, J., concurring). See also Nauga, Inc. v. Westel Milwaukee Co., Inc., 216 Wis. 2d 306, 318 n.5, 576 N.W.2d 573, (Ct. App. 1998) ("Violation of a rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The rules are not designed to be a basis for civil liability.").

¶63 The Menard Defendants argue that they have not invoked SCR 20:1.8(a) as a basis for civil liability, to obtain disciplinary sanctions, or as a procedural weapon. Instead, they look to the language of the amended preamble "because it establishes the standards of conduct with which Sands needed to comply if she wanted to enforce such an arrangement." Similar to Sands, the Menard Defendants ground their argument in the language of Foley-Ciccantelli. However, while Sands focuses on the language cited above, the Menard Defendants focus on ¶86, which reads, in part:

35

> The resolution of the issue of disqualification in the present case is thus guided by our prior case law and the precepts of the Supreme Court Rules of Professional Conduct for Attorneys regarding an attorney's duties to former clients. Appellate courts have often cited the Rules of Professional Conduct for guidance in non-disciplinary cases, including disqualification cases.

Foley-Ciccantelli, 333 Wis. 2d 402, ¶86.

¶64 The arguments of the Menard Defendants are not persuasive. Foley-Ciccantelli arose from a disqualification motion, not from a claim that the lawyer's conduct violated SCR ch. 20. Id., ¶91.

¶65 Accordingly, we conclude that SCR ch. 20 does not apply here for at least two reasons. First, Supreme Court Rules that regulate the ethical practice of law in Wisconsin cannot be used as an absolute defense in a civil action in which an attorney is a party. In that regard, we clarify Foley-Ciccantelli to so hold. Second, Sands' provision of legal services was not the practice of law, as we defined the practice of law in Mostkoff; therefore, she was not entitled to membership in the State Bar of Wisconsin during the times relevant to her Watts claim. Accordingly, she was not subject to SCR 20:1.8(a).

### D. Menard, Inc.'s Counterclaim

¶66 The court of appeals concluded that the accrual date for Menard, Inc.'s counterclaim for breach of fiduciary duty was September 1, 2005, the date of closing for the Fund transaction. As we consider the court of appeals' conclusion, we note that

the question presented is whether on September 1, 2005, Menard, as the president and CEO of Menard, Inc., knew or should have known that Sands' loyalty was questionable. Hansen v. A.H. Robins, Inc., 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983) (concluding that a claim accrues "on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first."). To answer that question, we consider Menard's personal characteristics.

¶67 Menard was a skilled businessman who had been involved in countless business transactions in his individual capacity and as the CEO of Menard, Inc. On September 1, 2005, he had enough information to be required to investigate further. As he said in regard to the closing of the transaction that created the Fund, "it was very difficult to tell whose side [she] was on, was she on [Hilbert's] side or my side." He also said that he then believed that Sands was lying to him. Although the degree of certainty of suspicion is variable, here, Menard was not a novice. He was in charge of a multi-billion dollar corporation. He also had outside advisors by his side. His suspicion triggered the obligation to investigate further, and he had plenty of assistance to do so. See Goff v. Seldera, 202 Wis. 2d 600, 611, 550 N.W.2d 144 (Ct. App. 1996) (citing Awve v. Physicians Ins. Co., 181 Wis. 2d 815, 825, 512 N.W.2d 216 (Ct. App. 1994)). Yet, he did nothing until after Sands sued him.

¶68 Even with the tolling rule of Donaldson v. West Bend Mut. Ins. Co., 2009 WI App 134, ¶¶23-24, 321 Wis. 2d 244, 773

37

N.W.2d 470, which makes the effective filing date November 3, 2008, Menard, Inc.'s counterclaim was well outside the applicable statute of limitations.[25]

E. Claim Regarding Trustees

¶69 Sands also appeals the court of appeals' dismissal of her claim against the Trustees, in which the court of appeals affirmed the circuit court's grant of summary judgment to the Trustees based on its earlier ruling granting partial summary judgment to the Menard Defendants. The court stated, "since there is no avenue to recover against the Menard principal, there cannot be recovery against the [Trustees]."

¶70 Before us, Sands' brief-in-chief asserted only what she styled as a Watts unjust enrichment claim, and in her combined response brief regarding the Menard Defendants and Trustees, Sands stated, "This Appeal is Solely a Watts v. Watts Unjust Enrichment Claim."

¶71 Watts, as we have discussed above in some detail, does not preclude an unmarried cohabitant from bringing an unjust enrichment claim on equitable grounds when the cohabitants engaged in a joint enterprise to work together to accumulate wealth and one cohabitant has retained the accumulated wealth in an unjust amount. Watts provides no support for an unjust enrichment claim made by a third party because unjust enrichment

---

[25] We concur with the conclusion of the court of appeals on this matter, and largely adopt their factual narration as our own. Sands, 372 Wis. 2d 126, ¶¶53-59.

claims are premised on two people working towards a joint accumulation of property in which they both expect to share equally.

¶72 However, we understand Sands' claim against the Trustees to be made under the theory that they are the repositories of significant property that once belonged to Menard. Therefore, if Sands were to prevail on what she has styled as a Watts unjust enrichment claim against Menard, she would need to reach the Trustees to garner a share of Menard's property that they hold. We offer no opinion on her theory of recovery from the Trustees because she has not prevailed on her unjust enrichment claim against Menard. Accordingly, she can have no interest in any property that the Trustees hold. Therefore, Sands' claim against the Trustees was properly dismissed.

### III. CONCLUSION

¶73 There were four issues argued before this court on appeal. First, we considered whether Sands has pled facts sufficient to show unjust enrichment. We conclude that she has not. Sands has failed to demonstrate facts which, if true, would support her legal conclusion that she and Menard had a joint enterprise that included accumulation of assets in which both she and Menard expected to share equally.

¶74 Second, we considered whether the court of appeals properly concluded that SCR 20:1.8(a) may be raised as an absolute defense to what Sands has styled as a Watts unjust

39

enrichment claim arising from a long-term romantic relationship. We conclude that SCR 20:1.8(a) may guide courts in determining required standards of care generally; however, it may not be employed as an absolute defense to a civil claim involving an attorney.

¶75 And finally, we also conclude that the court of appeals properly granted summary judgment to Sands on Menard, Inc.'s counterclaim for breach of fiduciary duty, and to the Trustees on their motion for summary judgment dismissing Sands' claim.

*By the Court.*—The decision of the court of appeals is affirmed.

40

¶76 SHIRLEY S. ABRAHAMSON, J. *(concurring in part and dissenting in part).* Unlike the majority, I conclude that Debra Sands pleaded sufficient facts to establish an unjust enrichment claim under Watts v. Watts, 137 Wis. 2d 506, 405 N.W.2d 303 (1987), against John R. Menard, Jr.[1] I would remand Sands' unjust enrichment claim against Menard to the circuit court for trial. Accordingly, I dissent from the majority's contrary conclusion.

I

¶77 I begin by setting forth the applicable standard of review, which is muddied by the majority. The supreme court reviews a grant of summary judgment independently, applying the same standards as employed by the circuit court. Dufour v. Progressive Classic Ins. Co., 2016 WI 59, ¶12, 370 Wis. 2d 313, 881 N.W.2d 678. "There is a standard methodology which a trial court follows when faced with a motion for summary judgment." Green Spring Farms v. Kersten, 136 Wis. 2d 304, 314, 401 N.W.2d 816 (1987).

¶78 "The first step of that methodology requires the court to examine the pleadings to determine whether a claim for relief has been stated." Green Spring Farms, 136 Wis. 2d at 315; see

---

[1] I agree with the following conclusions of the majority: (1) SCR 20:1.8(a) may guide courts in determining required standards of care for attorneys generally, but may not be used as an absolute bar in a civil claim involving an attorney; (2) the court of appeals properly granted summary judgment to Sands on Menard, Inc.'s counterclaim for breach of fiduciary duty; and (3) the court of appeals properly granted summary judgment to the Menard Trustees. Majority op., ¶3.

1

also <u>Moya v. Aurora Healthcare, Inc.</u>, 2017 WI 45, ¶15, 375 Wis. 2d 38, 894 N.W.2d 405. This step tests the "legal sufficiency of the complaint." <u>Kaloti Enters., Inc. v. Kellogg Sales Co.</u>, 2005 WI 111, ¶11, 283 Wis. 2d 555, 699 N.W.2d 205. All facts alleged in the complaint, as well as all reasonable inferences from those facts, are accepted as true, and the complaint is given a liberal construction. <u>Ollerman v. O'Rourke Co.</u>, 94 Wis. 2d 17, 24, 288 N.W.2d 95 (1980).

¶79 "If a claim for relief has been stated, the inquiry then shifts to whether any factual issues exist." <u>Green Spring Farms</u>, 136 Wis. 2d at 315. Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08.[2] The evidence is viewed in the light most favorable to the non-moving party, and all reasonable inferences are drawn in favor of the non-moving party. <u>Burbank Grease Servs., LLC v. Sokolowski</u>, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781. It is not the job of the court on summary judgment to "decide issues of credibility, weigh the evidence, or choose between differing but reasonable inferences from the undisputed facts." <u>Fortier v. Flambeau Plastics Co.</u>, 164 Wis. 2d 639, 665, 476 N.W.2d 593 (Ct. App. 1991).

II

---

[2] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

¶80 I conclude that the facts alleged in Sands' complaint, taken as true (as we must), adequately state a claim for unjust enrichment against Menard.[3]

¶81 An unjust enrichment claim has three elements: "(1) a benefit conferred on the defendant by the plaintiff, (2) appreciation or knowledge by the defendant of the benefit, and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable for the defendant to retain the benefit." Watts, 137 Wis. 2d at 531.

¶82 Watts did not change the elements of unjust enrichment. Nor did it create a sub-category of unjust enrichment claim. It merely recognized that unmarried cohabitants may state a claim for unjust enrichment where one party retains an unreasonable amount of property acquired through the efforts of both. As the Watts court explained:

> Many courts have held, and we now so hold, that unmarried cohabitants may raise claims based upon unjust enrichment following the termination of their relationships where one of the parties attempts to retain an unreasonable amount of the property acquired through the efforts of both.
>
> In this case, the plaintiff alleges that she contributed both property and services to the parties' relationship. She claims that because of these contributions the parties' assets increased, but that she was never compensated for her contributions. She further alleges that the defendant, knowing that the plaintiff expected to share in the property accumulated, "accepted the services rendered to him by the plaintiff" and that it would be unfair under the

---

[3] The operative complaint in the instant case is Sands' Second Amended Complaint.

circumstances to allow him to retain everything while she receives nothing.

Watts, 137 Wis. 2d at 532-33.

¶83 Additionally, nothing in Watts limits an unjust enrichment claim to two persons. A claim for unjust enrichment may involve more than two persons so long as all those involved worked towards the joint accumulation of property or wealth in which they all expected to share. Any contrary suggestion by the majority is unsupported. See majority op., ¶71.

¶84 In Watts, the plaintiff alleged that during her relationship with the defendant, she contributed both property and services to the parties' relationship with the expectation that she would enjoy equally with the defendant the wealth accumulated through their joint efforts. Watts, 137 Wis. 2d at 513-14. The plaintiff alleged:

> During their relationship, the plaintiff contributed childcare and homemaking services, including cleaning, cooking, laundering, shopping, running errands, and maintaining the grounds surrounding the parties' home. Additionally, the plaintiff contributed personal property to the relationship which she owned at the beginning of the relationship or acquired through gifts or purchases during the relationship. She served as hostess for the defendant for social and business-related events. The amended complaint further asserts that periodically, between 1969 and 1975, the plaintiff cooked and cleaned for the defendant and his employees while his business, a landscaping service, was building and landscaping a golf course.
>
> From 1973 to 1976, the plaintiff worked 20-25 hours per week at the defendant's office, performing duties as a receptionist, typist, and assistant bookkeeper. From 1976 to 1981, the plaintiff worked 40-60 hours per week at a business she started with the defendant's sister-in-law, then continued and managed

4

the business herself after the dissolution of that partnership.

Watts, 137 Wis. 2d at 513-14.

¶85  The Watts court held that the plaintiff stated a claim for unjust enrichment against her former cohabitant:

> In this case, the plaintiff alleges that she contributed both property and services to the parties' relationship.  She claims that because of these contributions the parties' assets increased, but that she was never compensated for her contributions.  She further alleges that the defendant, knowing that the plaintiff expected to share in the property accumulated, "accepted the services rendered to him by the plaintiff" and that it would be unfair under the circumstances to allow him to retain everything while she receives nothing.  We conclude that the facts alleged are sufficient to state a claim for recovery based upon unjust enrichment.

Watts, 137 Wis. 2d at 533.

¶86 In the instant case, Sands pleaded extensive facts spanning approximately eight pages of her complaint supporting her unjust enrichment claim against Menard.  Sands alleges in her complaint as follows:

> [D]uring the eight-year period of Sands's cohabitation and engagement with Menard, the substantial and continuing efforts of Sands resulted directly in the acquisition of valuable property, wealth, and substantial increase in the net worth of Menard, who now attempts to retain not merely an unreasonable amount of property, wealth, and increased net worth acquired through the efforts of Sands, but all of the property, wealth, and increased net worth acquired through the efforts of Sands.

Appendix to Brief of Plaintiff-Appellant-Petitioner Debra K. Sands, Volume I, at A061.

¶87 Sands summarized her contributions as follows:

> Sands relied on Menard's promises, representations, and conduct, and devoted over eight years to working

5

with and helping him in his business and personal matters. Sands contributed to their enterprise in numerous ways. She was Menard's life partner, social companion, and manager and hostess of his households. Sands protected Menard from unwanted approaches by serving as a "gate-keeper." She supervised his health care and medical needs; managed the remodeling of three residences; and advised on the acquisition of airplanes and their design and décor. She provided ideas for new products and product lines for the Menard, Inc., stores, such as garden centers; and scouted and proposed new store locations, store layouts, and product displays. She represented Menard, Inc., as a product buyer. She reviewed and suggested changes and additions to Menard, Inc., marketing plans. She assisted with government and public relations. She participated in the redesign of store signs and logos. She helped find new business and investment opportunities. She assisted in the management of the Team Menard auto racing venture and newly-acquired businesses, including two engine design companies in England, a thoroughbred racing business, and a $400 million private equity fund. She made her joint enterprise with Menard her focus, which occupied her every moment.

Brief of Plaintiff-Appellant-Petitioner, Debra K. Sands 14-15.

¶88 Construing Sands' complaint liberally and taking all factual allegations as true (as the court must), I conclude that Sands alleged facts sufficient to state a claim for unjust enrichment.

¶89 The majority concludes that Sands failed to adequately plead unjust enrichment by relying on inapposite cases and drawing distinctions that were not essential to the court's holding in Watts vis-à-vis the plaintiff's unjust enrichment claim.

¶90 The majority relies on Waage v. Borer, 188 Wis. 2d 324, 525 N.W.2d 96 (Ct. App. 1994), and Ward v. Jahnke, 220 Wis. 2d 539, 583 N.W.2d 656 (Ct. App. 1998), asserting that

6

these cases shed light on "the types of facts that must be pled in order to survive summary judgment." Majority op., ¶36. They do not. These cases do not support the majority's position.

¶91 In Waage, the court of appeals held that under the particular facts of that case, the complainant could not recover on her unjust enrichment claim because "Watts does not recognize recompense for housekeeping or other services unless the services are linked to an accumulation of wealth or assets during the relationship." Waage, 188 Wis. 2d at 330.

¶92 Importantly, the Waage court did not conclude that the complainant had failed to adequately plead unjust enrichment. Rather, the unjust enrichment claim proceeded to trial, and the court of appeals held that the complainant did not present sufficient evidence of any assets accumulated during the relationship as a result of joint efforts: "[Plaintiff] arguably alleged but did not set forth any evidence to satisfy [the elements of her unjust enrichment claim]. . . . [Plaintiff] presented absolutely no evidence of assets accumulated during their relationship." Waage, 188 Wis. 2d at 330. Simply stated, Waage has nothing to say about pleading requirements.

¶93 The Ward case also did not analyze the sufficiency of the complaint. In Ward, the question presented was the sufficiency of the evidence produced at trial.

¶94 In Ward, the complainant recovered at trial her fair share of the down payment on the couple's house, but the court of appeals held that the defendant had not been unjustly enriched following the purchase of the home. Ward, 220

7

Wis. 2d at 544-50. In so holding, the court of appeals pointed out that the plaintiff's own trial testimony established that after the couple moved into the home, the couple split household expenses as evenly as possible, so that a reasonable finder of fact could not find that the defendant had been unjustly enriched. See Ward, 220 Wis. 2d at 550-53.

¶95 In addition to relying on inapposite cases, the majority misunderstands what facts were relevant to the court's holding in Watts vis-à-vis the plaintiff's unjust enrichment claim. The majority magnifies differences in Sands' and Menard's personal relationship and in the personal relationship of the parties at the center of Watts.[4] For example, the majority points out that unlike in Watts, in which the plaintiff helped the defendant begin and grow his landscaping business, Menard was already a multi-millionaire and had been a successful businessman for almost 40 years when Sands and Menard met. Majority op., ¶48.

¶96 This reasoning suggests that the court would not have allowed the unjust enrichment claim in Watts to proceed if the

---

[4] The majority appears to acknowledge that the joint accumulation of property and wealth, not the nature of the relationship, is the focus of the unjust enrichment claim, see majority op., ¶¶33-34, 41-42, 44 n.19, 49 n.20, but nonetheless, the majority places great emphasis on these relationship differences, see majority op., ¶¶31, 48-49. The majority disclaims any reliance on a "checklist" of similarities with the specific facts of Watts, majority op., ¶40, but that is exactly what the majority does. What should readers rely upon for future cases: what the majority opinion says or what the majority opinion does?

8

defendant's business had already been established and profitable at the time the parties cohabitated, as opposed to being built from scratch by the efforts of both. Watts does not support this suggestion. The fact that Menard was already successful does not preclude Sands' unjust enrichment claim if Menard's assets became more valuable as a result of the parties' joint efforts.

¶97 The majority also highlights that "Sands has not alleged that during their relationship she and Menard commingled finances, filed joint tax returns, or made joint purchases of real and/or personal property. Sands did not obligate herself to any business or personal debt Menard incurred." Majority op., ¶49. These facts are not dispositive of unjust enrichment.

¶98 In Watts, we detailed certain aspects of the parties' relationship, but those facts were not necessary to our holding on the unjust enrichment issue. We explained:

> Early in 1969, the parties began living together in a "marriage-like" relationship, holding themselves out to the public as husband and wife. The plaintiff assumed the defendant's surname as her own. Subsequently, she gave birth to two children who were also given the defendant's surname. The parties filed joint income tax returns and maintained joint bank accounts asserting that they were husband and wife. The defendant insured the plaintiff as his wife on his medical insurance policy. He also took out a life insurance policy on her as his wife, naming himself as the beneficiary. The parties purchased real and personal property as husband and wife. The plaintiff executed documents and obligated herself on promissory notes to lending institutions as the defendant's wife.

Watts, 137 Wis. 2d at 513.

9

¶99 None of these facts reappears in the analysis of the plaintiff's unjust enrichment claim. See Watts, 137 Wis. 2d at 530-533. Rather, they were relevant to the plaintiff's claim that the plaintiff, the defendant, and their children constituted a "family," thus entitling her to bring an action for property division under Wisconsin's marriage dissolution statute. Watts, 137 Wis. 2d at 514-15.[5]

III

¶100 This matter is here on summary judgment. Although the majority opinion is confusing, it purports to dismiss Sands' unjust enrichment claim as inadequately pleaded. It nonetheless impermissibly ventures outside the pleadings to weigh the evidence, reaching the conclusion that Sands would not prevail on the merits of her unjust enrichment claim.[6]

---

[5] In support, the plaintiff relied upon a Washington court of appeals case with similar facts, Warden v. Warden, 676 P.2d 1037 (Wash. App. 1984). The Washington court of appeals applied its marriage dissolution statute to divide property acquired by unmarried cohabitants in what was tantamount to a marital family except for a legal marriage. We recognized that "Warden is remarkably similar on its facts to the instant case. The parties in Warden had lived together for 11 years, had two children, held themselves out as husband and wife, acquired property together, and filed joint tax returns." Watts, 137 Wis. 2d at 516. Thus, the plaintiff in Watts pleaded similar facts not to support her unjust enrichment claim, but because she was also arguing that her relationship with the defendant should be considered a "family" under Wisconsin's marriage dissolution statute.

[6] The majority concludes:

[D]espite the litany of contributions she made, we cannot conclude that Sands' contributions were "material" given Menard's wealth and the success of his company when the parties met. In particular,

(continued)

10

¶101 In contrast, I conclude that Sands pleaded sufficient facts to state a claim for unjust enrichment against Menard. After reviewing the summary judgment record, viewing all the evidence in the light most favorable to Sands, and drawing all reasonable inferences in her favor (as I must), I would hold

> although Sands has listed a series of business transactions in which she "participated" or "assisted," she has alleged no facts from which we could conclude that her contributions caused an increase in Menard's assets or property.
>
> We are similarly disinclined to conclude that Sands has pled sufficient facts which, if true, would demonstrate that Menard's acceptance or retention of her contributions would be inequitable under the circumstances.  In particular, Sands must demonstrate that the benefits she conferred to Menard are not offset by the benefits she derived from him.  First, the record indicates that Sands enjoyed an expansive lifestyle as the companion of a wealthy man.  Second, unlike the plaintiffs in Watts or Ward, Sands did receive compensation for some of her services.  Over the course of their eight-year relationship, Sands was paid $49,635.84 for the balance of her student loans, $3,000 to compensate her for "wedding expenses," and $152,105 for various legal services.

Majority op., ¶50-51 (footnotes omitted).  The majority noted specific examples of luxuries enjoyed by Sands as Menard's companion including "multiple boating and skiing trips, vacations to St. Martin, London, and Italy, and . . . a Ford Mustang for Christmas in 2005.  They went to horse races, NASCAR events, and fashion shows, and met prominent political figures at that time."  Majority op., ¶51 n.21.

Clearly, the majority reaches beyond the pleadings and has substituted itself as the finder of fact in order to resolve genuine issues of material fact in favor of Menard.  At this stage, it is not the court's task to "decide issues of credibility, weigh the evidence, or choose between differing but reasonable inferences from the undisputed facts."  Fortier, 164 Wis. 2d at 665.

11

that genuine issues of material fact preclude summary judgment. I would remand Sands' unjust enrichment claim to the circuit court for trial.

¶102 For the reasons set forth, I write separately.

¶103 I am authorized to state that Justice ANN WALSH BRADLEY joins this separate writing.